1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF VIRGINIA
 2                    RICHMOND DIVISION


 3

 4
    _____
                                   )
 5  UNITED STATES OF AMERICA       )
                                   )
 6  v.                             )     Criminal Case No.:
                                   )     3:24 CR 18
 7  WILLIAM R. HALL                )
    _____)
 8                                       August 16, 2024

 9
                COMPLETE TRANSCRIPT OF SENTENCING
10             BEFORE THE HONORABLE ROBERT E. PAYNE
                UNITED STATES DISTRICT COURT JUDGE
11

12  APPEARANCES:

13  Avishek Panth, Esquire
    OFFICE OF THE UNITED STATES ATTORNEY
14  919 E. Main Street, Suite 1900
    Richmond, Virginia 23219
15
            Counsel on behalf of the United States
16

17  Charles R. Samuels, Esquire
    CHARLES R. SAMUELS, ATTORNEY AT LAW, PLLC
18  4908 Monument Avenue, Suite 100
    Richmond, Virginia 23230
19
            Counsel on behalf of the Defendant
20

21

22

23

24              TRACY J. STROH, RPR
                OFFICIAL COURT REPORTER
25            UNITED STATES DISTRICT COURT
```

1                          **I N D E X**

2                            WITNESSES

3    Examination By:                                      Page

4                        WILLIAM HALL
     Direct    – MR. SAMUELS                               11
5    Cross     – MR. PANTH                                 21

6


7                            EXHIBITS

8    Exhibit       Description                           Page

9    Defendant's
     No. 1        Letter from defendant's employer          9
10   No. 2        Letter from defendant's sister           10
     No. 3        Letter from defendant's mother           10
11   No. 4        Copy of defendant's work schedule        10

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (The proceeding commenced at 1:30 p.m.)

2          THE CLERK:  In the matter of Criminal Case

3   Number 3:24 CR 18, *United States of America v. William R.*

4   *Hall*.

5          The United States is represented by Avi Panth,

6   and the defendant is represented by Charles Samuels.

7          Are counsel ready to proceed?

8          MR. PANTH:  The government's ready.

9          Good afternoon, Your Honor.

10         MR. SAMUELS:  On behalf of my client, we are

11  ready to proceed.

12         THE COURT:  All right.

13         MR. PANTH:  Shall I present the case,

14  Your Honor?

15         THE COURT:  Please.

16         MR. PANTH:  Your Honor, we're here for a

17  sentencing hearing for William R. Hall, who was charged in

18  a one-count criminal information and pled guilty

19  preindictment to conspiracy to commit bribery, in

20  violation of 18 U.S.C. Section 371.  The maximum penalties

21  for this offense, 5 years in prison, 3 years supervised

22  release, $250,000 file, and a $100 special assessment.

23         The guidelines in this case reflect that the

24  defendant has a criminal history category of III, a total

25  offense level of 19, leading to a guidelines range of 37

1    to 46 months.

2           The defendant -- and the government has no

3    objections or corrections to the PSR as stated, and my

4    understanding is the defendant has not raised any

5    objections or corrections either.

6           Defendant does have a motion for downward

7    variance and a motion for downward departure that the

8    Court will also need to take up.  And the government's

9    moved for a one level reduction for acceptance of

10   responsibility.

11          THE COURT:  If the defendant is remanded, do you

12   ask for immediate confinement?

13          MR. PANTH:  I will, Your Honor.  And that is --

14   the Court is permitted wide discretion on this.  I would

15   look to, you know, the certainty of -- I mean, number one,

16   defendant, he has showed up to proceedings here, but he

17   does have a criminal history and, you know, that, paired

18   with, you know, if the Court decides to impose a period of

19   incarceration, gives rise to a potential risk of flight.

20   But, I mean, candidly, I think it's time for him to show

21   up and, you know, he's been aware that this day has been

22   coming.

23          THE COURT:  All right.

24          Will you stand up, Mr. Hall?

25          Have you read the presentence report?

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  Have you been over it with your

3 lawyer?

4          THE DEFENDANT:  Yes, sir.

5          THE COURT:  Did you understand it?

6          THE DEFENDANT:  Yes, sir.

7          THE COURT:  At the back of it, in pages 26

8 through 29, there are discussions of the mandatory

9 conditions, the standard conditions, and the special

10 conditions of supervised release.  Did you go over those

11 with the probation officer and your lawyer?

12         THE DEFENDANT:  Yes, sir.  I'm currently on a

13 federal supervised release so I'm very understanding of

14 the rules and conditions.

15         THE COURT:  But did you go over the ones at the

16 back?

17         THE DEFENDANT:  Yes, sir.

18         THE COURT:  And on the pages I cited?

19         Show them to him there, Mr. Samuels.

20         MR. SAMUELS:  Yes, sir.  And you said which

21 page?

22         THE COURT:  Twenty-six, 27, 28, and there's one

23 sentence on the top of 29.

24         Did you all go over all those and do you

25 understand them is the question?

1          MR. SAMUELS:  Judge, we went line by line

2    through the entire presentence report, including those we

3    went through.

4          THE COURT:  Is that right, Mr. Hall?

5          THE DEFENDANT:  Yes, sir.

6          THE COURT:  And do you understand those

7    conditions?

8          THE DEFENDANT:  Yes, sir.

9          THE COURT:  All right.  And are there any

10   objections to the presentence report?

11         MR. SAMUELS:  There are none from our side,

12   Judge.

13         THE COURT:  All right.  The presentence report

14   will be accepted, adopted and filed as tendered.  It will

15   be placed in the record.  It will be under seal.  It will

16   be available in the event of any appeal except for the

17   confidential sentencing recommendation part of it.

18         All right.  You may be seated.

19         Now, there's a motion for downward departure.

20   The first aspect of that motion, ECF Number 34, is a

21   motion to depart from the guidelines pursuant to guideline

22   section 5K1.1.

23         I, yesterday, entered an order denying that

24   because that is a motion that, under the guidelines, is to

25   be made in the first instance by the government.  So I

1  think the law is clear on that.  Did you have something

2  else that I ought to know about in that respect that

3  allows the defendant to bring it?

4          MR. SAMUELS:  No, sir, not in respect to that

5  specific portion of my motion.

6          THE COURT:  Yes.  All right.

7          And then there's a motion to depart pursuant to

8  5K2.0.  Do you have evidence on that?

9          MR. SAMUELS:  Judge, we don't have evidence on

10 that.  We would rely on our motion and the arguments made

11 there, as well as our response to the Commonwealth's

12 response to our motion.

13         THE COURT:  You mean the government.

14         MR. SAMUELS:  Oh, excuse me.  Yes, the

15 government.

16         THE COURT:  So you have no evidence?

17         MR. SAMUELS:  Judge, the evidence that we

18 have --

19         THE COURT:  The answer is yes or no.

20         MR. SAMUELS:  Yes, sir, we have evidence.

21         THE COURT:  All right.  Can I have -- then you

22 also have a motion for a variance.  That's ECF 33.  Do you

23 have evidence on that?

24         MR. SAMUELS:  It would be substantially similar

25 evidence, yes, sir.

1          THE COURT:  All right.  Present your evidence.

2          MR. SAMUELS:  Judge, would you be willing to

3  allow me to discuss the variance first?

4          THE COURT:  Why?

5          MR. SAMUELS:  I believe there is a stronger

6  argument there than for the other.

7          THE COURT:  Well, is that saying you're

8  withdrawing the request for the departure and want to rely

9  on the variance instead?

10          MR. SAMUELS:  No, sir.  I believe there's an

11  argument for both.  I was just trying to give you the best

12  argument first.

13          THE COURT:  Well, I think that's what Justice

14  Frankfurter told lawyers, "If you can't win on that one,

15  you can't win on any of them."  So -- but -- so we'll go

16  with ECF 33.

17          MR. SAMUELS:  Yes, sir.

18          Judge, you've heard about my client's -- or

19  you've read about my client's situation.  He was a model

20  prisoner.  He did get two shots in eight years.  Apart

21  from this situation, he --

22          THE COURT:  He did what?

23          MR. SAMUELS:  He got written up twice in eight

24  years, apart from this situation.

25          Since his release, he not only was successfully

1   employed almost immediately, but then he got a better

2   paying job.  I have here letters from his employer stating

3   that he is an important part of their team, and I'd ask to

4   introduce that now.

5               THE COURT:  Any objection?

6               MR. PANTH:  No objection, Your Honor.

7               THE COURT:  What is it, Defense Sentencing

8   Exhibit 1?

9               MR. SAMUELS:  Yes, sir, please.

10              THE COURT:  I've read it.  It's admitted.

11              (Defendant Exhibit Number 1 was admitted.)

12              MR. SAMUELS:  Judge, next, as you recall from my

13  written motions, his sister, while he was in FCI for the

14  last eight years, was taking care of their mother.  She is

15  essentially in hospice care at this point.

16              Since his release, he has been taking care of

17  her in spite of the fact that she lives an hour and a half

18  away from him.  His sister has written a letter describing

19  the changes she's seen in him since his release and the

20  work he has done with his mother.

21              THE COURT:  Is that Defense Sentencing

22  Exhibit 2?

23              MR. SAMUELS:  Yes, sir, please.

24              THE COURT:  Any objection?

25              MR. PANTH:  No objections, Your Honor.

1       THE COURT:  It's admitted without objection.

2       (Defendant Exhibit Number 2 was admitted.)

3       MR. SAMUELS:  Your Honor, next is a letter --

4       THE COURT:  Just a second.  I'm reading it.

5       MR. SAMUELS:  Oh, I'm sorry.

6       THE COURT:  All right.  I've read it.

7       MR. SAMUELS:  Your Honor, next is a letter from

8  his mother describing the need of him to continue to care

9  for her.

10      THE COURT:  That will be Defense Sentencing

11 Exhibit 3.

12      MR. SAMUELS:  Thank you, Judge.

13      Then Sentencing Exhibit 4 for me, I have a copy

14 of his work schedule.  They were so confident in him that

15 they have scheduled him throughout the rest of the year.

16 And his days are in red.  So his job is very secure.

17      THE COURT:  Thank you.

18      Any objection?

19      MR. PANTH:  No objections to any of those

20 exhibits.

21      THE COURT:  Exhibits 3 and 4 admitted without

22 objection.

23      (Defendant Exhibit Number 3 was admitted.)

24      (Defendant Exhibit Number 4 was admitted.)

25      MR. SAMUELS:  Judge, I would like to call my

William Hall – Direct                11

1  client to testify about his current situation.

2          THE COURT:  All right.  Call him to the stand

3  and have him sworn.

4                    **WILLIAM HALL,**

5  called by the defendant, first being duly sworn, testified

6                    as follows:

7               **DIRECT EXAMINATION**

8  BY MR. SAMUELS:

9  Q    Mr. Hall, about eight years ago you were convicted of

10 a federal crime, correct?

11         THE COURT:  Just for the record, your name?

12         THE WITNESS:  My name is William Hall.

13         THE COURT:  You're the defendant in this action?

14         THE WITNESS:  I'm sorry?

15         THE COURT:  You're the defendant in this action?

16         THE WITNESS:  Yes, sir.

17         THE COURT:  All right.

18 BY MR. SAMUELS:

19 Q    Mr. Hall, approximately eight years ago you were

20 convicted of a federal crime?

21 A    That is correct.

22 Q    And you've spent the last approximately eight years

23 in federal correctional institutes?

24 A    That is correct.

25 Q    All right.  In that time, tell the judge about your

1  development.

2  A     You know, when I first caught my charge, I was not

3  living correctly, and prison saved me.  I went to prison.

4  It saved my life.  I spent my time in prison trying to

5  make myself be a different person.  I didn't want to come

6  out of prison the person I was before I went into prison.

7  I stayed out of trouble.  I did what I was supposed to do.

8  I did everything I was supposed to do.

9           Upon -- before I got released from prison, I was

10  approached by a prison guard, and he was going to be

11  missing a lot of work, and he asked me to help him.

12  Q     And let me interrupt you there.  How long did it take

13  after he first approached you before you agreed to --

14  A     About four months.

15  Q     All right.

16  A     And --

17  Q     And he approached you about -- was it selling

18  something?

19  A     Yeah.  He wanted me to help him make money, whether

20  it be contraband, whatever it was.  And I was not

21  comfortable with this.  And he kept pressuring me and

22  pressuring me, and eventually I said okay.  I made a very

23  bad decision.  I agreed to help him.

24  Q     When you say he was pressuring you, did he suggest

25  that you would get a bad name in the yard?

William Hall - Direct                           13

1   A    Yeah.  He was putting me in a very uncomfortable

2   situation, you know.  He was the prison guard.

3   Q    Did he suggest that he would set you on -- not

4   literally set you on fire, but make it so that your life

5   was --

6   A    I mean, yeah.  Prison guards can make your life

7   easier or rougher, you know, and he definitely was, when I

8   wasn't willing to help him, making my life rougher.

9           THE COURT:  Well, did he threaten you?

10           THE WITNESS:  He didn't directly threaten me,

11  no, sir.  It was just more his aggressive demeanor and the

12  treatment.

13  BY MR. SAMUELS:

14  Q    So at that point after four months, you gave in?

15  A    I gave in and I told him, I said, I will not do

16  anything that is illegal in this prison.  You know,

17  tobacco in prison, if you get caught with tobacco in

18  prison, they make you mow the grass or clean up, you know,

19  extra duty.

20           So I said, you know what.  I will agree to do

21  that because I know I'm not going to get in no serious

22  trouble for that.  I had no idea it would become something

23  like this.

24           This happened for a one-month period.  They were

25  pulling 150, 160 people off the yard and transferring them

1  to another prison.  I was quickly to volunteer myself to

2  be one of those people to get out of that situation.

3  Q     And that's how you ended up at Fort Dix?

4  A     That's how I ended up at another prison, at Fort Dix.

5  Q     Now, in that month's time, you did help with this.

6  You're not denying that you --

7  A     I'm not denying that.  I did it.  You know, he -- you

8  know, the government has painted a picture of a big

9  conspiracy, but reality of it is he brought me tobacco a

10  couple of times and I sent him his half of the money for

11  it.  I didn't even get --

12             THE COURT:  Brought you what?

13             THE WITNESS:  Tobacco.

14  A     And I didn't even get no money for it.  I made $900,

15  you know, and that's it.  And this went on for a month.

16             I transferred to another prison and went back to

17  living properly.  I got released from prison, and the

18  minute I got to the halfway house I went to work.  I

19  visited my mother and I seen the condition my mother was

20  in, because I hadn't seen my mother in eight years.  I

21  seen the condition my mother was in and immediately

22  started using my home passes to go take care of my mother

23  every weekend.

24  BY MR. SAMUELS:

25  Q     Now, you never, in prison, tested positive for any

1  illegal substances?

2  A    I've never tested positive for drugs.

3  Q    And you're on color code now while you're on

4  probation?

5  A    That is correct.

6  Q    And you have not tested positive at any point now --

7  A    No.

8  Q    -- either?

9  A    No.  And my PO speaks very highly of me.  I currently

10 see a federal psychiatrist to make sure that -- to help

11 me.

12       But immediately from leaving the halfway house,

13 you know, I had a job in Lexington, a very good job.  I

14 moved an hour and a half away to be close to my mother to

15 take care of her.  I get up at 3 in the morning.  I drive

16 an hour and a half to work.  I work a 12-hour shift.  I

17 drive an hour and a half home.  I stop by and make sure my

18 mother has food, make sure her medicine is right, make

19 sure she has clean diapers, make sure she's had her bath.

20       I'm married.  My wife is 14 weeks pregnant.  I'm

21 doing everything I should do.

22 Q    You have other children also?

23 A    I have other children that I take care of.

24 Q    And you are required to pay child support for those

25 kids?

William Hall - Direct                    16

1   A     Absolutely.

2   Q     And because of your job, you're able to make those

3   payments?

4   A     I'm able to make those payments.

5   Q     And you have an eight-year arrears that you need

6   to --

7   A     That is --

8   Q     -- catch up on --

9   A     -- correct.

10  Q     -- as well, correct?

11           THE COURT:  Wait a minute.  One of you at a time

12  talk.

13           MR. SAMUELS:  Sorry.

14  A     Basically, yeah, I am doing everything that a normal

15  citizen does, you know.  I'm not -- I'm not doing no life

16  of crime.  I'm not doing anything.  Prison fixed me.  It

17  did.

18           I know that I committed a crime on this case.  I

19  know that things went wrong.  I know I should not have

20  agreed to help him, but I got what I deserved the first

21  time.  I got fixed.  To go back to prison right now in my

22  life, the way I'm living life, I just -- I can't wrap my

23  head around it.

24           Do I deserve a penalty?  Yes.  Absolutely.  I

25  just hope that when you lay down your sentence, you

1    take -- maybe consideration of an ankle monitor or

2    something.  I don't know.  But I'm only taking care of my

3    family.  That's it.

4    BY MR. SAMUELS:

5    Q    Are you the asking the judge to consider something

6    besides active incarceration?

7    A    I absolutely am.  I'm asking to consider any other

8    measure, whether it would be home incarceration, ankle

9    monitor, so I can still support my wife, take care of my

10   mother.

11         You know, me and my wife live paycheck to

12   paycheck.  If I go away, will she still be able to pay our

13   rent and take care of our unborn child?  No.

14         And the sad thing is this happened years ago

15   while I was in prison.  This didn't happen last month.

16   This is years ago while in prison.

17   Q    Now, the government did indicate that you were

18   cooperative, that this proceeded by an information.  What

19   happened when you were first approached by the government?

20   A    The minute the government approached me, they asked

21   me, they said, listen, would you be willing to do a

22   preindictment resolution?  I said absolutely.  What do you

23   need to know?  I answered all their questions.  I told

24   them everything they wanted to know immediately.

25         I don't want to look at myself as a convict or a

1   criminal.  And they're the government.  They're asking

2   questions.  I'm going to answer them, you know.  I'm not

3   trying to -- I just want to be a normal citizen again, you

4   know, and I don't see myself in that light no more and I

5   don't want to be in that light.

6   Q      You have a specific set of vocational skills.

7   A      Yes.

8   Q      Have you ever taught anything at, like, a community

9   college or any sort of college-level classes?

10  A      I used to teach college classes.  I taught at

11  Universal Technical Institute.  I taught automotive

12  design, collision technology.  You know, that's what I do

13  normally is I work in collision work.  I build cars and

14  motorcycles.

15  Q      Were you the education manager?

16  A      I was an education manager, and I was also a

17  curriculum writer.

18             THE COURT:  Also what?

19             THE WITNESS:  A curriculum writer, where I wrote

20  the curriculum for the classes.

21  A      I know -- I know there was a crime committed.  I know

22  I should not have helped that man.  For what we did, to

23  put me back in prison for three or four years, man,

24  that's --

25  BY MR. SAMUELS:

William Hall - Direct                    19

1  Q    Your oldest child is 16?

2  A    No.  My oldest child is 32.

3  Q    I'm sorry.  The under the age of 18 children that you

4  have, your oldest child is --

5  A    She is 16 years old.

6  Q    And you've redeveloped a relationship with her?

7  A    I've redeveloped a relationship with her, which was

8  very challenging because she had a lot of animosity due to

9  me going to prison.

10        Matter of fact, you know, I send her a text

11 message every day.  We just now, within the past couple of

12 months, where she'll let me come see her and we'll go out

13 and do things together.  I went and visited her yesterday

14 before I left town to come here, you know.

15 Q    So if you go to jail -- or prison for three years,

16 she'll be 19 when you get out?

17 A    Yeah.

18 Q    And your youngest will be about 3?

19 A    Yeah, because she's -- she's due in February.

20        THE COURT:  What?

21        THE WITNESS:  I'm sorry.  My wife is due in

22 February.  She's pregnant now.

23 A    Like I said, I'm not living a criminal life.  My

24 parole officer, if he could be here, he would tell you I'm

25 doing everything I'm supposed to do, you know.  And I

William Hall - Direct                    20

1  shouldn't be rewarded for that.  I know that.  That's what
2  you're supposed to do.  But I'm not living a life of
3  crime, you know, and now I'm sitting here facing, in your
4  courtroom, something from two, three years ago in prison.
5  You know, I've made it to the world.  I served my time.
6  I -- you know, I didn't -- I'm just trying to live life
7  and put my family in a better situation, you know.

8          And at this point, if I stay at my job -- my job
9  is waiting for this proceeding to end and they want to
10  advance me to a much higher position as soon as -- if I
11  come back from here and say, yes, I'm able to still work,
12  the day I come back I'm able to go to a much higher
13  position and I could buy a home by February for me and my
14  wife.  I could put a deposit down on a house, you know,
15  and put my family in a home.
16  Q    Your mom's condition --
17  A    I would like -- if I can get my home, put my mother
18  in the home with us.
19  Q    Tell me about how dire it is.
20  A    She has Cushing's disease.
21          THE COURT:  What's that?
22          THE WITNESS:  Cushing's disease.
23          THE COURT:  Yes.
24  A    She is completely handicapped.  She cannot walk.  I
25  do have to help her change her diapers.  I do have to help

William Hall - Cross                    21

1   her bathe.  My work schedule is two days on, two days off.

2   And that's why I keep that job.  I drive an hour and a

3   half to go to that job because of that.  Because those two

4   days off, I can cook her meals for the next two days.  I

5   can cook her meals that she can package up and be able to

6   heat up and eat for the next two days.  I've got to make

7   sure she takes her medication right because sometimes she

8   forgets to take it or sometimes she might forget that she

9   already took it and took it again.  So I lay it out in her

10  little boxes and then I check it and make sure she took

11  her medicine the way she's supposed to be taking it.

12  Q    And the sister that had been caring for her has moved

13  away?

14  A    Yes.  She's further away now.  And, you know, she

15  owns a business that's -- she's a struggling business

16  that's failing, you know, and she has two children of her

17  own, and she's doing all she can to keep her business

18  afloat.

19  Q    Is there anyone else that can help your mother if

20  you're not available?

21  A    Nobody.

22           MR. SAMUELS:  Those are my questions, Judge.

23           THE COURT:  All right.  Cross-examination.

24                    **CROSS-EXAMINATION**

25  BY MR. PANTH:

1  Q      Now, Mr. Hall, you recall that you came to this

2  courthouse on April 8th of 2024, right?

3  A      Yes, sir.

4  Q      And you came before I believe one of our magistrate

5  judges?

6  A      Yes, sir.

7  Q      And in that, you had what was called a plea colloquy;

8  is that right?

9  A      What is it?

10 Q      Let me explain.  So in that hearing, the judge asked

11 you -- put in front of you something called a statement of

12 facts, right?

13 A      That's correct.

14 Q      And put in front of you something called a plea

15 agreement, right?

16 A      That's correct.

17 Q      And you had a chance to go over the statement of

18 facts and plea agreement before you came to court, right?

19 A      That's correct.

20 Q      And you reviewed it and you, in fact, signed it,

21 right?

22 A      Yes, sir.

23 Q      Both documents, you signed them?

24 A      Yes, sir.

25 Q      And in both documents, when you signed them, you

23

1    asserted that these are true and correct to the best of

2    your knowledge and understanding, right?

3    A    Yes.

4    Q    Okay.  So now, in that hearing the Court asked you is

5    everything in the statement of facts true and correct,

6    right?

7    A    Uh-huh.

8    Q    And you said yes; isn't that right?

9    A    Yeah.

10   Q    Okay.  I want to go over some items from your

11   statement of facts.  And I apologize.  I don't -- if I had

12   known that you would've taken the stand, I would have had

13   a separate copy for you, but I'm reading off the PSR.

14   This is page 7.  So at various times -- well, actually,

15   let me take a step back.

16           So your statement of facts listed an individual

17   named CC-2; is that right?  Kayla Cronin.

18   A    Yes.

19   Q    Are you familiar with Kayla Cronin?

20   A    Yes.

21           THE COURT:  Just a minute.  Do you have a

22   statement of facts?

23           MR. SAMUELS:  Yes, sir, I do.  I was just

24   whispering up to Mr. Panth.

25           THE COURT:  The clerk's going to print one out

1   for him.

2                MR. SAMUELS:  I could hand one over to him.

3                THE COURT:  All right.

4                Go ahead and print it anyway, please.

5                MR. SAMUELS:  You can just give it to him.  I

6   don't need it.

7   BY MR. PANTH:

8   Q    And what I'll be talking about right now is part

9   9(c).  So if you can go to 9, subsection (b) and (c).

10  A    Page 9?

11  Q    You got it?  Not page 9.  It's paragraph number 9.

12  A    Okay.

13  Q    Take a moment and just make sure you can refresh

14  yourself.  I want to make sure you have a chance to take a

15  look through it.

16  A    Okay.

17  Q    Okay.  So now, at a high level, I mean, I think -- my

18  understanding of what took place, and what it says here,

19  is that -- I mean, so making reference to 9(d).  It says,

20  "Hall further told Cronin to send Hall's share of the

21  proceeds of the smuggling operation to various associates

22  (including Hall's mother)"; is that right?

23  A    Uh-huh.

24               THE COURT:  Is that yes?

25               THE WITNESS:  Yes.  Yes, I had her -- I asked

William Hall – Cross                    25

1   her one time to send my mother -- you know, the money was

2   supposed to go half to the correction officer, half to me.

3   I asked Cronin one time to send my mother $1000.  She sent

4   her $900.  That's the only money I ever received.

5   Ms. Cronin kept my half of the money.  I never received

6   another dime.

7   BY MR. PANTH:

8   Q    Okay.  So you're saying in the entire scheme, Cronin

9   only ever sent your mother $900 on one occasion?

10  A    Yes.

11  Q    That's your testimony now?

12  A    Yes.

13  Q    Okay.  Well, let's go on here.  So looking at 9(e),

14  "Hall told Cronin the exact amounts to be paid to CC-2,

15  and Cronin, in turn, paid such amounts to CC-2, pocketing

16  small amounts of money for facilitating the transaction."

17  That's what that says, right?

18  A    Yeah.

19  Q    Okay.  All right.  Let's move on to part (f).

20          THE COURT:  Well, is that true?

21          MR. PANTH:  I'm sorry?

22          THE COURT:  Is what he said in there true?

23          THE WITNESS:  I mean, that was the arrangement,

24  yes.  Ms. Cronin was supposed to keep $200 -- we sold the

25  tobacco for $2200.  The correction officer was supposed to

William Hall - Cross                        26

1   get $1000.  Ms. Cronin was supposed to get $200.  I was

2   supposed to get $1000.  Ms. Cronin was to hold my share of

3   the money until I came home from prison.

4            Well, she never gave me my share of the money.

5   I never received any more money than the $900 she sent my

6   mom.  I asked her to send her $1000.  She sent her 900.

7   That was the only money I ever received.

8            THE COURT:  What paragraph were we reading from?

9            MR. PANTH:  Now we're on part (f), which is on

10  page 7 of the PSR, at the very top of page 7.  But this --

11           THE COURT:  I want to go back to (e).

12           MR. PANTH:  Yes, Your Honor.

13           THE COURT:  It says, "Hall told Cronin the exact

14  amounts."  That tells me that there was more than one

15  amount, one time this happened.

16           THE WITNESS:  Yes, sir.  It happened two

17  separate times, yes, sir.

18           THE COURT:  Two times.

19           THE WITNESS:  Yes.  That's why there was two

20  accounts.  Just like in my PSR, I had -- they gave me two

21  points of enhancements for each time, and it was a total

22  of four points of enhancements.  Yes, sir.

23           THE COURT:  All right.

24  BY MR. PANTH:

25  Q    Okay.  And it wasn't just tobacco, right?  It was

William Hall - Cross                    27

1   also steroids.

2   A    No.  It was only tobacco.

3   Q    So you're saying that steroids never got smuggled

4   into the prison as a result of this scheme?

5   A    No.  We've been arguing this fact since day one.  And

6   you can look through any of the records.  My attorney has

7   brought this issue up since day one.

8            This correction officer had steroids on him

9   every single day.  We worked out and lifted weights in our

10  work area.

11           THE COURT:  He did what?

12           THE WITNESS:  He had steroids on him every

13  single day.  He took steroids every day while we worked

14  out.  One time he was like, "Try this," and he squirted it

15  in my mouth, and I started having adverse reactions from

16  it.

17  BY MR. PANTH:

18  Q    He forced it in your mouth?

19  A    Well, he was like, "Here, try it, try it, try it."

20           And I was like, "I don't know.  I never did it

21  before."

22           He's like, "It will be okay."

23  Q    Did he force you to take steroids or not?  That's a

24  simple question.

25  A    No.  I agreed to take it.  But that was the only time

William Hall - Cross                    28

1   steroids and me ever had -- you know, he squirted it in my

2   mouth one time, and then I asked Ms. Cronin on the phone

3   what was that -- ask him what that was he gave me, because

4   I started having problems from it.

5   Q    Okay.  Let's move on.  So then you say that "Cronin,

6   acting solely at Hall's direction, delivered funds to CC-2

7   by mailing money to CC-2 by U.S. Postal Service."

8            So you designated exactly the amounts of money

9   that Cronin would send to Hall; is that right?

10  A    She would send to Mr. Thomas.

11  Q    No.  But you told her exactly how much to send to

12  Mr. Thomas, right?

13  A    Yes.

14  Q    And you told her when to send it to Mr. Thomas,

15  right?

16  A    Yes.

17  Q    Okay.  And "At Hall's direction, Cronin also passed

18  coded messages about the introduction of prohibited

19  objects into FCC Petersburg."  That is also what you said

20  here at the statement of facts, right?

21  A    That is correct.

22  Q    Okay.  All right.  I want to go --

23            THE COURT:  What was the prohibited object?

24            THE WITNESS:  Tobacco.

25  BY MR. PANTH:

William Hall - Cross                           29

1  Q    Okay.  I want to go down, if I can, to part 10,

2  10(c).  So at the very bottom there it says, "Hall then

3  directed Cronin to send $1000 to the landlord."  Who was

4  the landlord, by the way?

5  A    That would be Mr. Thomas.

6  Q    Okay.  "Send $1000 to Hall's mother, and keep $200

7  for herself."  Do you see that?

8  A    Yes.

9  Q    Okay.  And that happened, right?

10 A    Yeah.  That's -- well, she sent her 900.  She didn't

11 send her the thousand.

12 Q    That's when you're saying she only sent her 900?

13 A    Right.  That's correct.

14 Q    Okay.  Got it.  Then if I can, I want to go to part

15 (g).  Same paragraph, part (g).  At the very bottom there,

16 "In this conversation, Cronin agreed to pay CC-2 2000,

17 retain 2000 for Hall, as directed by Hall."  That

18 happened, right?

19 A    Yeah.  But like I say --

20 Q    But you're saying you never got the money?

21 A    I never got the money.  She kept all that.

22 Q    Your mom never got the money?

23 A    She got the original 900.  That was it.

24 Q    But no more?

25 A    No more.  Cronin was supposed to hold on to the money

William Hall - Cross                    30

1   for me until I came home, and when I came home, she said

2   no, she spent it.

3   Q    Okay.  All right.  So who would you sell the tobacco

4   to?

5   A    I gave the tobacco to one person, and I believe he's

6   the other person on this case that's never mentioned where

7   he said he sent Cronin money.

8              I gave it to one person.  That was it.  I wasn't

9   in there selling cigarettes to all the prisoners.  I took

10  it from Mr. Thomas and handed it to one person.

11  Q    And who was that person?

12  A    We called him Six.  I don't know his government name.

13  Q    Your testimony is you don't know his name?

14  A    We called him Six.  In prison everybody goes by a --

15  like, a nickname or whatever.

16  Q    Do you know his name?

17  A    I do not know his government name.

18  Q    Okay.  Okay.  So what would he do -- how much would

19  tobacco go for in the prison?

20  A    In the prison, when he would bring it to me -- I

21  don't know what he would sell it for.  I have no idea.

22  Q    I'm asking for your transaction with him.

23  A    My transaction was $2200.

24  Q    $2200 for how much tobacco?

25  A    For -- for a pound of tobacco.

William Hall - Cross

31

1    Q    Okay.  So you would give him a pound of tobacco, and

2    he would give you $2200?

3    A    Right.

4    Q    How would he pay you $2200?

5    A    He would send it to Kayla on Cash App.

6    Q    Okay.  All right.

7              THE COURT:  $2200 for tobacco?

8              THE WITNESS:  Yes, sir.

9              THE COURT:  And it was a pound?

10             THE WITNESS:  Yes, sir.

11             THE COURT:  How did you get a pound of tobacco?

12   Did you take cigarettes and break them down into -- tear

13   them apart or did you buy --

14             THE WITNESS:  The officer would bring in a loose

15   bag of tobacco.  Now, whether he went to the store and

16   bought it as a loose bag or how he produced that bag, I

17   don't know that.

18   BY MR. PANTH:

19   Q    All right.  Okay.  But you were -- you were

20   essentially directing Kayla Cronin on who to send the

21   money to, how to send the money and in what amounts,

22   right?

23   A    Yes.

24   Q    Okay.  All right.  Now, there were certain times in

25   this market -- you're saying the market -- it was only

William Hall - Cross                    32

1 sold to one other person, but in this marketplace, you had

2 too much inventory on hand, right?

3 A    I mean, I always went to the same person.

4 Q    Let me say this another way.  So there were times

5 when you had too many bikes that you could not sell in the

6 prison?

7           THE COURT:  Too many what?

8           MR. PANTH:  So bikes was a code name for

9 tobacco.

10 A    We referred to the tobacco as motorcycle units.

11           THE COURT:  You had too many bags --

12 A    Basically, the officers kept bringing it, and the guy

13 that I was giving it to didn't have it all sold yet.  So I

14 had to wait.

15           THE COURT:  You say "kept bringing it."  It

16 sounds like there's a lot of events.  You say it's only

17 twice.  I'm getting confused.

18           THE WITNESS:  Well, what he did -- this happened

19 through a month period of time.  I only sent him money

20 twice.  But he actually, during that month, it was --

21 basically, he told me, "I'll bring you ten of them for

22 $10,000, and you sent me five and five."  There was two

23 times I sent him money.  But it didn't work out that way.

24 But that was the original plan, so to say.

25 BY MR. PANTH:

William Hall - Cross                     33

1   Q    Well, there were actually three separate bribes,

2   right?

3            In the statement of facts, there's one on

4   October 17th, one on October 22nd, and one on

5   November 27th, right?  So --

6   A    November 27th I wasn't even at that prison anymore.

7   I was at a whole other prison by then.

8   Q    Okay.  But there was still -- I mean, you still

9   directed Cronin to send money --

10  A    It was from the original money that there was still

11  money owed.

12            THE COURT:  When did you go to the other prison?

13            THE WITNESS:  I left that prison I think in

14  October.

15            THE COURT:  It says, on page 10, paragraph (o),

16  on or about November 6, you told Cronin something.  Were

17  you communicating with her by telephone?

18            THE WITNESS:  Yeah, I was communicating by

19  telephone.  And after I moved to the other prison, there

20  was still money owed to the officer when I left, and I was

21  trying to make sure that he got his money that was owed to

22  him.

23  BY MR. PANTH:

24  Q    So there were periods of time, then, when you had too

25  much tobacco that you could not sell, right?

1    A    Yeah.

2    Q    And in those times, you directed Cronin to stop

3    getting the tobacco into the prison.  In other words, you

4    told Cronin to tell Thomas, stop bringing the tobacco in?

5    A    That's correct.

6    Q    So there were times when you told -- you essentially

7    communicated to Thomas, hey, stop it?

8    A    Yeah.

9    Q    Okay.

10             THE COURT:  How many times?

11             THE WITNESS:  Well, the one time I finally was

12   like, stop.  Stop, please.

13             THE COURT:  You say one time and then you said

14   times.  I mean, you all are talking about using plurals

15   and singulars indiscriminately.  I'm confused about how

16   many times.

17             THE WITNESS:  He brought it in -- through that

18   one month period of time, he probably brought it in, like,

19   three times a week.  He'd keep bringing it to me.  So

20   there was -- he wanted a total of ten is what he was

21   trying to get to.  So one week he brought me three.

22   Another week he brought me four.  He was trying to get to

23   ten, and that was what he was trying to do.  His goal was

24   to get $10,000.

25             THE COURT:  All right.

1  BY MR. PANTH:

2  Q    And then on October 30th you told Cronin, "I can

3  still keep this shop up and running, and then start a new

4  shop, you know what I mean."  And additionally, then you

5  said, "Because you know, for real, for real, me getting

6  landlord, a shop landlord that works with me the way

7  landlords working with me now, that's very rare, you know.

8  That's like a once in a lifetime opportunity."

9          You said that, did you not?

10  A    Actually, in that conversation we were actually

11  talking about bringing an actual shop.  That had nothing

12  to do with the tobacco and all that.

13  Q    Oh, okay.  So on one hand --

14          THE COURT:  Whoa, whoa, whoa.  I didn't

15  understand what that was all about.

16          MR. PANTH:  Okay.

17          THE COURT:  Somebody slow it down and put it in

18  perspective.

19          MR. PANTH:  Yes, Your Honor.

20          THE COURT:  Which paragraph are you talking

21  about?

22          MR. PANTH:  We're referring now to subparagraph

23  (n).

24  BY MR. PANTH:

25  Q    And let's take it piece by piece.  So on

William Hall - Cross                                    36

1  October 30th, 2022, you're still incarcerated, right?

2  A     Yeah.

3  Q     And your testimony was --

4              THE COURT:  But you're at that other prison now?

5              THE WITNESS:  Yes.

6  BY MR. PANTH:

7  Q     So you're still in prison on October 30th of 2022?

8  A     Uh-huh.

9  Q     And your earlier testimony was that you used

10 motorcycle shop language --

11 A     We used motorcycle shop --

12 Q     Please let me finish.

13             THE COURT:  Wait a minute.  Let the question be

14 asked and then you can answer it.

15             THE WITNESS:  Yes, sir.

16 BY MR. PANTH:

17 Q     So -- and this is clear in the statement of facts.

18 You used shop, bike, landlord and rent as code words for

19 the illicit activity that was taking place.  True or

20 false?

21 A     True.

22 Q     Okay.  So now, on October 30th of 2022, you say, "I

23 can still keep this shop up and running."  I can still.

24 So you're talking about still keeping a shop that's in

25 existence as of that time.  True or false?

William Hall - Cross                    37

1  A     True.

2  Q     Okay.  So you can still keep the shop up and running

3  and then start a new shop.  You know what I mean.  So at

4  this point, I mean -- when was your transfer to the other

5  facility?

6  A     In October.

7  Q     So that same month you were being transferred to

8  another prison facility?

9  A     Yes.

10 Q     And you're talking about starting a new shop, right?

11 A     Yes.

12 Q     Okay.

13 A     But you're -- but that's out of context because --

14        THE COURT:  But the word "shop" there, that

15 means -- that's a code word for the arrangement you all

16 had.

17        THE WITNESS:  Yes, sir, we was using that code

18 word because we do run shops.  We do run motorcycle shops.

19 So we were using that as a code word because we already

20 speak about that stuff.  We do run shops.

21        THE COURT:  I know, but here in this statement

22 of facts -- you've got it in front of you -- in paragraph

23 (n) --

24        THE WITNESS:  Yes, sir.

25        THE COURT:  -- you were talking about setting up

1  a new operation.  Where?  In another prison or --

2          THE WITNESS:  No.  I was talking about

3  building -- we had already -- there's conversations that

4  they don't have in here where we were talking about

5  bringing the facility to -- I have bike employees who used

6  to build motorcycles for me who are looking for jobs.  I

7  was getting ready to get out of prison.  I was trying to

8  set up a new shop to where I could come out of prison and

9  going to work building motorcycles.

10  BY MR. PANTH:

11  Q    But on October 30th, 2022, you weren't getting out of

12  prison then.  You were being transferred to another prison

13  facility.

14  A    My prison date was coming up.  I was supposed to be

15  getting out in March.

16  Q    And you're talking about opening a new bike shop with

17  Kayla Cronin?  Because Kayla Cronin is on the other side

18  of this conversation, right?

19  A    Kayla Cronin has always helped me with my finances,

20  the whole time I was in prison.  The whole time I was in

21  prison, any finances I had from the free world, because

22  you have to have somebody in the free world to deal with

23  your finances.

24  Q    Kayla Cronin came before this Court --

25  A    I already know this.

William Hall - Cross                                    39

```
 1              THE COURT:  Wait a minute.  Wait a minute.

 2              In paragraph (n) in front of you -- have you got

 3    it?  Have you read it?  Page 10.  Read it to yourself.

 4    You say -- finish it up and let me know when you finish.

 5              THE WITNESS:  Okay.

 6              THE COURT:  All right.  Are you finished?

 7              THE WITNESS:  Yes, sir.

 8              THE COURT:  You say, "I can still keep this shop

 9    up and running."  What shop are you talking about?

10              THE WITNESS:  We currently have been trying to

11    open up a motorcycle shop.

12              THE COURT:  Where?

13              THE WITNESS:  In Lexington.

14              THE COURT:  When you got out?

15              THE WITNESS:  For when I got out.

16              THE COURT:  "And then start a new shop."

17              THE WITNESS:  We were trying to get that shop

18    up --

19              THE COURT:  So you were thinking about getting a

20    new -- two shops going?

21              THE WITNESS:  No.  What I was referring to was

22    the shop in the prison and then getting a real motorcycle

23    shop, maybe using the money from that to open up an actual

24    motorcycle shop.

25              THE COURT:  But you weren't talking about
```

William Hall - Cross                    40

1  transacting business and selling tobacco in this
2  conversation?
3           THE WITNESS:  No.  I was talking about --
4           THE COURT:  Okay.  Now, the next one says,
5  "Because, you know, for real, for real, me getting
6  landlord."  Who is that?
7           THE WITNESS:  That I'm referring to as the
8  correction officer.
9           THE COURT:  All right.  And then "a shop
10 landlord that works with me the way landlords working with
11 me now."  What did the landlord have to do with the shop?
12          THE WITNESS:  What I was trying to explain --
13 what we were saying in this -- and like I say, they only
14 pulled out certain content.  I was wanting to use the
15 money that we made from the correction officer to open up
16 a real shop to where when I got out of prison in a few
17 months, I could go to work there.  That's what I was
18 trying to do.  But in the end, I never even received none
19 of the money.
20          THE COURT:  All right.
21 BY MR. PANTH:
22 Q    So just to be clear, your testimony to this Court is
23 that you were actually using shop in two different
24 contexts?
25 A    Yes.

William Hall - Cross                    41

1  Q     Within the same sentence, right?

2        So on one hand, you're referring to shop being

3  the illicit smuggling operation --

4  A     Uh-huh.

5  Q     -- and on the other hand, in that same sentence

6  you're using shop to refer to a legitimate business you

7  planned to open when you got out?

8  A     Correct.  That's meaning I could get another shop

9  going.  That's what I was trying to say.

10 Q     Okay.  All right.  And so when you said, "That's like

11 a once in a lifetime opportunity," you're referring to the

12 illegal smuggling operation that's taking place already at

13 that point, right?

14 A     Yes.

15 Q     Okay.  So -- so -- okay.  All right.

16        Let's move on, if we can, to part (u).

17 December 16th, 2022.  Take a moment and just read through

18 it so you're familiar.

19 A     Okay.

20 Q     All right.  So you told Cronin then in a recorded

21 phone call, "You need to make sure the landlord is still

22 playing ball because he may not be.  So go ahead and send

23 him a message, maybe tonight, and say, hey, you know,

24 trying to drop a bike off."  You said that, right?

25 A     Uh-huh.

William Hall – Cross                    42

1  Q      And when you're talking about a bike there, you're

2  talking about this illicit smugging operation, right?

3  A      Yeah.  We owed him money.

4  Q      You owed him money for what?

5         THE COURT:  No.  The question is that you used

6  the word bike.  What did you mean by bike in that

7  sentence?

8         THE WITNESS:  The bike either meant tobacco or

9  the money owed for tobacco.

10        THE COURT:  Well, what did it mean in that

11 sentence?

12        THE WITNESS:  In that sentence, what I was

13 referring to is when I left, we owed the officer money

14 because he dropped off something before we left and the

15 people had not paid for it yet.  And that's why I messaged

16 her saying, hey, make sure he's still okay, make sure he's

17 still playing ball, make sure he's still okay because we

18 haven't paid for it yet and I don't want him being upset.

19 BY MR. PANTH:

20 Q      Okay.  But there was a certain point when Thomas was

21 out of commission.  Do you recall that?

22 A      Yeah.

23 Q      When he had his operation and he had taken extended

24 leave?

25 A      That's when this started is after he left.

1   Q    So when you say, "You need to make sure the landlord

2   is still playing ball" -- okay.

3   A    I want to make sure he's still okay, he's not upset,

4   he's not going to be giving me problems in another prison.

5   All these correction officers talk.

6   Q    That's fine.

7              MR. PANTH:  I have no further questions,

8   Your Honor.  Thank you.

9              THE COURT:  Any questions?  Anything else,

10  Mr. Samuels?  Any other questions on redirect?

11             MR. SAMUELS:  Judge, I don't have any other

12  questions.  I just have argument.

13             THE COURT:  Then you can step down, sir.

14             (Witness stood aside.)

15             THE COURT:  All right.  Any evidence?

16             MR. PANTH:  Not from the government, Your Honor.

17             THE COURT:  Any other?

18             MR. SAMUELS:  Nothing else except for argument,

19  Judge.

20             THE COURT:  All right.  Go ahead.

21             MR. SAMUELS:  Do you want me to approach?

22             THE COURT:  Yes.

23             MR. SAMUELS:  Your Honor, we're not asking for

24  active incarceration.  We're specifically asking you not

25  incarcerate him today or for an active period of time.  We

1    are asking, instead, for an alternative to incarceration,

2    and the reason is for everything that you've just heard.

3            If sitting in that chair was illegal and you as

4    a judge told me, an attorney, go sit in that chair, I

5    would go sit in that chair because you are a person in

6    authority over me and I don't want to be found in contempt

7    and thrown in the back.  However, I am also committing a

8    crime by doing it.

9            That's the situation that we found Mr. Hall in

10   is a situation where he decided, after months of pressure,

11   to give in.  He thought he was going to be able to help

12   his family, and he didn't very much.  But everything

13   you've heard today --

14           THE COURT:  That's the defense of coercion.

15           MR. SAMUELS:  Judge --

16           THE COURT:  That's the defense of coercion, also

17   the basis for a -- can be -- there can be departure --

18   ground for departure, but we're arguing the variance now.

19   And you say in it, your variance motion, page -- there's

20   no numbered pages at the bottom like there's supposed to

21   be, but page 2 of the document, it's 2 of 4 of the

22   ECF numbering system, "Mr. Hall was coerced or under

23   duress when he began participating in this conspiracy."

24           Now, if he's under duress, he's made an

25   improvident guilty plea and he didn't tell that to the

1    magistrate judge.  So now you come to sentencing and you

2    raise what amounts to a substantive defense.

3              MR. SAMUELS:  Judge, as I recall at the

4    allocution, we made two comments about the statement of

5    facts.

6              THE COURT:  Mr. Zychowski, what is the guideline

7    section on departure?

8              MR. ZYCHOWSKI:  For coercion?

9              THE COURT:  Yeah.

10             MR. ZYCHOWSKI:  5K2.12.

11             THE COURT:  5K2.12, yeah.  Thank you.

12             "If the defendant committed the offense because

13   of serious coercion, blackmail or duress, under

14   circumstances not amounting to a complete defense, the

15   Court may depart downward.  The extent of the decrease

16   ordinarily should depend on the reasonableness of the

17   defendant's actions on the proportionality of the

18   defendant's actions to the seriousness of coercion,

19   blackmail or duress involved, and on the extent to which

20   the conduct would have been less harmful under the

21   circumstances as the defendant believed them to be.

22   Ordinarily, coercion will be sufficiently serious to

23   warrant departure only when it involves a threat of

24   physical injury, substantial damage to property or similar

25   injury resulting from the unlawful action of a third party

1   or from a national emergency.  Notwithstanding this policy

2   statement, personal financial difficulties and economic

3   pressures upon a trade or business do not warrant a

4   downward departure."

5           So we wouldn't qualify.  But there's really no

6   evidence here of any kind about coercion.  It's just that

7   he -- as I understand it, the guard, Thomas, made the

8   request several times, and the guard -- there is a

9   relationship of subordinate/superior between the guard,

10  who is the superior, and the prisoner, who is the

11  subordinate, and the guard has some inchoate opportunities

12  to make life miserable for the defendant.

13          MR. SAMUELS:  Yes, sir, give him the bad name in

14  the yard, set him on fire, those sorts of things.

15          THE COURT:  Yeah.  So you're not saying he had a

16  defense of coercion, are you?

17          MR. SAMUELS:  No, sir.  I'm saying that whenever

18  the situation you just heard about occurs, although it may

19  not be considered, under 5K2.12, a serious coercion, it is

20  still something to consider when looking at what this

21  gentleman ought to have happen to him.

22          THE COURT:  So that would be the circumstances

23  of the offense.

24          MR. SAMUELS:  Yes, sir.

25          THE COURT:  I see.

1          MR. SAMUELS:  And then you've also heard the
2   situation with his family.  You've heard the fact that
3   he's become gainfully employed, that he is --

4          THE COURT:  But that doesn't have anything to do
5   with committing the offense.  That's raising the question
6   of post-offense rehabilitation.

7          MR. SAMUELS:  Yes, sir.  And that's why we
8   pled --

9          THE COURT:  Which is a different matter.  It
10  comes under the category of the history and
11  characteristics of the defendant.

12         MR. SAMUELS:  Which is one of the things I
13  believe the Court has to consider when sentencing.

14         THE COURT:  Yeah.

15         MR. SAMUELS:  Yeah.

16         THE COURT:  I'm just trying to figure out where
17  you are because your papers don't tell me where any of
18  this fits.

19         MR. SAMUELS:  Well, Judge, hopefully my closing
20  will.  He didn't get into trouble in prison.  He is paying
21  his child support.  He is supporting his family.  He has
22  obtained not one but two jobs.  He's providing for his
23  very, very sick mother even though it requires an extra
24  three hours a day just in driving.

25         And at the end of the day, Judge, this is

1 cigarettes.   I don't know what a pound of tobacco turns

2 into in terms of actual cigarettes.   I know that about

3 0.05 pounds is one cigarette, but as a lawyer, my math is

4 not good enough to get there very quickly.

5       What you're looking at, Judge, is a gentleman

6 who was in a situation where he admitted to it

7 immediately, did everything he could to cooperate.   He

8 offered to provide additional information.   He did nothing

9 but cooperate.   And he's pled guilty to this crime, saving

10 the taxpayer money by doing it off of an information

11 instead of going through the whole rigmarole, and we have

12 an opportunity today, Judge, to not only acknowledge that,

13 but to acknowledge the $40,000-a-year cost that it's going

14 to cost the federal government to house, feed and clothe

15 him when he could, instead, be one of the people paying

16 the taxes to make sure that those who are in prison are

17 getting what the bare minimum is that they need.

18       THE COURT:   What do you think the record is

19 about whose idea the scheme was in the first place?   Where

20 does the record show me about that?

21       MR. SAMUELS:   I don't believe the record

22 specifically shows you whose idea it was.   I do believe --

23       THE COURT:   Well, his testimony is that it was

24 Thomas' idea because Thomas came to him.

25       MR. SAMUELS:   Oh, yes, sir, I do believe that.

1    I thought you meant --

2              THE COURT:  What about the rest of the record?

3              MR. SAMUELS:  I thought you meant in the

4    statement of facts.

5              THE COURT:  Anywhere.

6              MR. SAMUELS:  I don't believe anywhere else in

7    the record it says who approached who.  And as defense

8    counsel, it's very hard for us to prepare those kinds of

9    pieces of evidence.  It's kind of like what Mr. Hall said.

10   If you take one or two sentences, yes, I did say those

11   things, but here's what they --

12             THE COURT:  Take one or two sentences from

13   where?

14             MR. SAMUELS:  From October 30th, 2022, or

15   December of 2022.  Instead of the full conversation, you

16   don't want to read out of context what they mean.  And I

17   think that's what the back and forth between Mr. Panth,

18   Your Honor, and Mr. Hall was all about is trying to

19   understand what was really being said.

20             But the bottom line is this gentleman sold

21   tobacco, making very little money, and paid a guard who

22   brought in the tobacco an amount based on the guard's

23   plan.  And that's really what we're looking at here,

24   Judge.

25             I just can't stress enough --

1          THE COURT:  You say based on the guard's plan.

2  In other words, the guard planned it.

3          MR. SAMUELS:  Yes, sir, the guard --

4          THE COURT:  And he talked the defendant into it.

5          MR. SAMUELS:  Yes, sir, as you heard.

6          THE COURT:  And the defendant got the money from

7  inside the prison.

8          MR. SAMUELS:  Yes, sir.  Well, it was -- it was

9  done over Cash App, but yes.  So it's not like they were

10 handing him actual dollar bills.

11         THE DEFENDANT:  No.  You know, the guard told me

12 how much --

13         THE COURT:  No, but the source of the money came

14 from prisoners.

15         THE DEFENDANT:  Correct.

16         MR. SAMUELS:  Yes, sir.

17         THE COURT:  And then that money went to whom?

18         MR. SAMUELS:  It went to --

19         THE DEFENDANT:  Ms. Cronin.

20         MR. SAMUELS:  -- Kayla Cronin, Correctional

21 Officer Thomas --

22         THE COURT:  It went to Kayla Cronin.

23         MR. SAMUELS:  Yes, sir.

24         THE COURT:  And Cronin did what with it?

25         MR. SAMUELS:  She kept $200 of it.  She sent

1   1000 of it to Mr. Thomas, the correctional officer.  She

2   sent $900 to Mr. Hall's mother, and then the rest she

3   kept.

4          THE COURT:  Well, that's one transaction.

5          MR. SAMUELS:  I believe we're here only on the

6   one count, yes, sir.

7          THE COURT:  What?

8          MR. SAMUELS:  I believe we're just here on the

9   one count, yes, sir.  The statement of facts I believe

10  goes over the entire month period.  I believe our

11  agreement was that he would be charged with the -- or pled

12  guilty to one count.

13         THE COURT:  Well, but we're not talking about

14  one count.  We're talking about -- we are talking about

15  one count, but we're not talking about one transaction.

16         MR. SAMUELS:  Yes, sir.

17         THE COURT:  We're talking about a conspiracy

18  that embodied several transactions.

19         MR. SAMUELS:  Yes, sir.

20         THE COURT:  So how many other instances were

21  there this 1000, 1000, 200 --

22         MR. SAMUELS:  Off the top of my head --

23         THE COURT:  -- split?

24         MR. SAMUELS:  Off the top of my head, I do not

25  recall.  I can ask my client, but I do not recall off the

1  top of my head.

2        THE COURT:  I'm confused about what they were

3  asking him.  I don't understand what the answer is.  He

4  says he only got a total of $900.  That's one thing --

5        MR. SAMUELS:  Yes, sir.

6        THE COURT:  -- one transaction, and yet we're

7  discussing -- and the $900 didn't go to him.  It went to

8  his mother.  Now, I'm confused about whether that's true

9  or not.  He's raising his hand back there.  You might want

10 to go talk to him.

11       THE DEFENDANT:  I would like to clarify it.

12       MR. SAMUELS:  Judge, he was just reviewing his

13 testimony with me.  The one transaction where he received

14 the $900 -- there were other transactions.  However, he

15 did not receive any money for the other transactions.

16       THE COURT:  Where did that money go?

17       MR. SAMUELS:  He testified that Ms. Cronin kept

18 it.

19       THE COURT:  So all -- she kept all of it?

20       MR. SAMUELS:  Anything that she did not send to

21 Mr. Thomas, she kept.  And you heard Mr. Hall state that

22 when he got out -- or I guess technically before he got

23 out, he learned that she had spent it and he didn't have

24 any at all.

25       THE COURT:  So during the course of the

1  conspiracy in these numerous events when this tobacco came

2  in, there were how many times that money came out and that

3  $1000 goes to the guard and the rest of it goes to Cronin?

4         MR. SAMUELS:  Judge, if I recall from the

5  testimony today and what's in the statement of facts and

6  the report, in one week there was an amount of tobacco

7  that came in.  In the second week, there was another

8  amount of tobacco that came in, and in the third week,

9  there was another amount of tobacco that came in.

10        It did not come in, you know, in a handsome

11 brick shape of tobacco.  It came in little by little over

12 multiple days during the week.

13        THE COURT:  That may be correct, but it's not

14 what I asked about.

15        MR. SAMUELS:  Oh, I'm sorry.  I misunderstood

16 your question, then.

17        THE COURT:  How many times were there the

18 transactions in which the landlord, the guard, got a

19 thousand and Ms. Cronin got the other thousand?

20        MR. SAMUELS:  I believe -- Judge, it was my

21 understanding that there probably was about eight

22 transactions like that.

23        THE COURT:  Okay.  And then there was a

24 transaction where the landlord got a thousand and the

25 defendant's mother got 900 and Cronin got 200?

1          MR. SAMUELS:  Yes, sir.  The correctional

2  officer got a thousand.  The mother got 900.  Mr. Hall got

3  zero, and Ms. Cronin got a thousand.  But I think that's

4  one of the eight.

5          THE COURT:  Okay.  So there was -- to answer my

6  question, there were seven --

7          MR. SAMUELS:  Separate from that.

8          THE COURT:  -- in which the guard got a thousand

9  and Cronin got a thousand, and there was one in which the

10 guard got a thousand, the defendant's mother got 900 and

11 Cronin got 200; is that correct?

12         THE DEFENDANT:  That's correct.

13         MR. SAMUELS:  Yes, sir.

14         THE COURT:  All right.  So there were eight

15 different payoffs.

16         MR. SAMUELS:  Yes, sir.  Events.  Yes, sir.

17         THE COURT:  But in order to have enough tobacco

18 available to sell for that amount of money, to yield

19 $2000, you had to have several deliveries of tobacco to

20 the prison?

21         MR. SAMUELS:  Yes, sir.  The prison guard would

22 bring in tobacco regularly.

23         THE COURT:  All right.  He brought it in.  And

24 then what's the record show about what he did with it when

25 he brought it in?  Where did it go?

1          MR. SAMUELS:  I don't believe the record -- I

2    believe the record is silent about that.  We acknowledge

3    that it went to my client to distribute.

4          THE COURT:  And what did he do with it?

5    Stockpile it until he got the amount necessary to produce

6    what money they wanted or what?

7          MR. SAMUELS:  Your Honor, the record is silent

8    as to that, but you can --

9          THE COURT:  Well, he said that he paid somebody

10   inside.  Who was that?

11         MR. SAMUELS:  That was the inmate known as Six.

12         THE COURT:  So did all of these eight

13   transactions involve delivering the tobacco to Six and

14   getting the money from Six?

15         MR. SAMUELS:  Yes, sir.

16         THE COURT:  Has Six been prosecuted?

17         MR. SAMUELS:  No, sir.  We don't have a name to

18   provide.  We know -- we have other names, but not that

19   one, that we are --

20         THE COURT:  Six hasn't been prosecuted?

21         MR. SAMUELS:  Not to my knowledge.

22         THE DEFENDANT:  He's in this paperwork stating

23   how much money he sent to Ms. Kayla.  So the government

24   knows who he is.

25         THE COURT:  Okay.

56

1          MR. SAMUELS:  So even though my client does not

2     know, it would appear that the government does.

3          THE COURT:  How many deliveries does the record

4     show there were to Six from your client?

5          MR. SAMUELS:  I don't believe the record

6     specifically states the number of deliveries, Judge.

7          THE COURT:  All right.

8          All right.  Anything else?

9          MR. SAMUELS:  Judge, just a reiteration, what

10    we're talking about on the high end is probably 700

11    cigarettes, if it's --

12          THE COURT:  How do you know that?  How do we

13    know that?

14          MR. SAMUELS:  Well, Judge, in my conversations,

15    it would appear that there was a total of 7 pounds of

16    tobacco over the course of this month.

17          THE COURT:  Is that in the record?

18          MR. SAMUELS:  I believe it is in the record.

19          MR. PANTH:  It's not.

20          MR. SAMUELS:  Oh.  Just --

21          THE COURT:  Do you agree it was 7 pounds?

22          MR. PANTH:  Candidly, Your Honor, we only have a

23    limited snapshot of information on which to make this

24    assessment; these prison phone calls, text messages from

25    Kayla Cronin.  We don't have a lot of optics in terms of

1    exactly what went on in the prison.

2              So the record is silent as to the full weight --

3              THE COURT:  He pled guilty and he agreed to

4    cooperate, did he, Mr. Hall did?

5              MR. PANTH:  There was no cooperation agreement,

6    Your Honor.  We never debriefed with him at all.

7              THE COURT:  Did you debrief with Thomas?

8              MR. PANTH:  We did not.

9              THE COURT:  Cronin?

10             MR. PANTH:  Well, I don't want to get --

11             THE COURT:  Yeah.  I mean, I want to know --

12   here's the thing.

13             MR. PANTH:  We did debrief with Cronin,

14   Your Honor.

15             THE COURT:  You all tell me that --

16             MR. PANTH:  We did debrief with Cronin.

17             THE COURT:  You all come in here with these

18   stories, and they're almost fanciful and ridiculous, and

19   you say you don't have enough information --

20             MR. PANTH:  What is this?

21             THE COURT:  -- but you've got to have some meat

22   to go on a dish.

23             MR. PANTH:  We did debrief with Cronin,

24   Your Honor, and Cronin --

25             THE COURT:  Well, did Cronin tell you how many

1   pounds there were?

2           MR. PANTH:  Cronin did not know how many pounds

3   there were.  And Your Honor had a chance to actually

4   examine Ms. Cronin's record, her medical history, how she

5   was coerced by the defendant.  The defendant is the only

6   one who got an aggravated role enhancement in this

7   situation.  Ms. Cronin was vulnerable.  And, I mean, that

8   is the record at least that was before the Court with

9   respect to Ms. Cronin.

10          And the statement of facts here reveals that

11  Cronin did everything at the defendant's direction, this

12  defendant's direction.  He's --

13          THE COURT:  Okay.  I'll get with -- so we don't

14  know how much was involved, really?

15          MR. PANTH:  Correct.

16          THE COURT:  All right.

17          MR. SAMUELS:  By my math, it was about 23

18  cigarettes a day, Judge.

19          THE COURT:  Where did you get that?

20          MR. SAMUELS:  I took the average weight of a

21  cigarette.  I took the number of pounds of tobacco that

22  were brought into the prison, based on my understanding,

23  and then I figured out how many packs of cigarettes that

24  would be, how many cartons of cigarettes that would be,

25  divided it by the number 30, and that's the number I came

1   up with.

2           THE COURT:  Thirty, why?  Why did you divide it

3   by 30?

4           MR. SAMUELS:  Thirty days in a month.  Instead

5   of 31.  I was trying to be on the conservative side.

6           THE COURT:  Oh, I see.  All right.

7           So basically, the request for a variance boils

8   down to what, in categories?  Family circumstance?

9           MR. SAMUELS:  Yes, sir.

10          THE COURT:  And that includes his mother and a

11  pregnant wife and other children.  And then the mother's

12  situation is assisting her as she declines.  And you said

13  she was in hospice.  He didn't say that.

14          MR. SAMUELS:  I believe maybe I misspoke.

15          THE DEFENDANT:  She's not in hospice.  She's in

16  very bad shape.

17          THE COURT:  All right.

18          MR. SAMUELS:  I only talked to her once, and I

19  must have misunderstood what she said.

20          THE COURT:  And then post-offense

21  rehabilitation.  Is that it?

22          MR. SAMUELS:  Yes, sir.

23          THE COURT:  Okay.  Go ahead.  Anything else on

24  the variance?

25          MR. SAMUELS:  No, sir.

1            THE COURT:  All right.  So what about the -- the

2    same evidence applies to the departure, right?

3            MR. SAMUELS:  It is, Judge.

4            THE COURT:  Okay.  So what's the grounds for the

5    departure?  5K1.1 doesn't fly.  I've denied that one.

6            So the departure is what?  5K2. -- what?

7            MR. PANTH:  5K2.0.

8            MR. SAMUELS:  Yes, sir.

9            THE COURT:  What?  Point what?

10           MR. SAMUELS:  Judge --

11           MR. PANTH:  Zero.  5K2.0 is what --

12           THE COURT:  5K2.0.  That's what you say?

13           MR. SAMUELS:  Yes, sir.

14           THE COURT:  Okay.  So what fits in there?  The

15   same things?

16           MR. SAMUELS:  Judge, we believe the majority of

17   those things do fit in:  The mother, the child support,

18   the children, the wife, I believe the employment and

19   post --

20           THE COURT:  The employment -- all that is

21   post-offense rehabilitation.

22           MR. SAMUELS:  Yes, sir, you're right.

23           So that's what we would argue, Judge.

24           THE COURT:  Now, 5K2.0(2), "Departures based on

25   circumstances of a kind not adequately taken into

1  consideration."

2          MR. SAMUELS:  And it was our position that in

3  the presentence report the situation with his mother,

4  wife, children, et cetera, had not been taken into

5  consideration.

6          THE COURT:  Well, did you read all of (2),

7  "Departures of a kind not adequately taken into

8  consideration"?

9          MR. SAMUELS:  I did, but I do not have it in

10 front of me at the moment.

11         THE COURT:  It says 5 -- this Subpart --

12 Chapter 5, Part K, Subpart 2, Other Grounds for Departure,

13 Identified Circumstances.  "Identifies some of the

14 circumstances that the Commission may not have adequately

15 taken into consideration in determining the applicable

16 guideline range.  If such circumstance is present in the

17 case and has not been adequately taken into consideration

18 in determining the applicable guideline range, a departure

19 consistent with 18 U.S.C. Section 3553(b) and the

20 provisions of this subpart may be warranted."

21         Now, what parts of the identified guidelines are

22 you relying on here in this chapter?

23         MR. SAMUELS:  Judge, if I understand your

24 question --

25         THE COURT:  I want you to put them in the

1   guideline section they -- that the guidelines use so we

2   can see what goes on.

3         MR. SAMUELS:  Judge, I believe --

4         THE COURT:  You have coercion and duress.

5   There's 5K2.12.  You have diminished capacity, that's one.

6   That's not in this case.  But I know -- it appears that

7   you are arguing coercion and duress, and that's one of the

8   circumstances that they identify.  So which ones are you

9   proceeding on?

10        If you're going to use the departure part of the

11  guidelines, you have to go the whole mile and use the

12  whole guidelines so I know what you're talking about.

13  Otherwise, you're just making a variance motion.  If

14  that's what you're doing, say that's what you're doing and

15  we'll move on with it.

16        Now, where do you put it?

17        MR. SAMUELS:  I'm sorry, Judge?  Where do I put

18  him?

19        THE COURT:  5K2.16, Voluntary Disclosure of the

20  Defense.

21        Do you have a guideline book with you?

22        MR. SAMUELS:  No, sir.  It's on my computer, but

23  I wasn't able to bring that in.

24        THE COURT:  You were allowed to bring your

25  computer in.  You couldn't bring a cell phone in.  You

1  were given permission to bring a computer in, wasn't he?

2          THE CLERK:  When I came back in from your

3  chambers, he was walking into the courtroom.  So he didn't

4  have the form before he got here, Your Honor.

5          THE COURT:  Oh, okay.

6          MR. PANTH:  He can borrow mine.

7          THE COURT:  I just need to know where you are so

8  that I can properly analyze the thing.

9          MR. SAMUELS:  Yes, sir.  Judge, here is my

10 theory under 5K2.10.

11         THE COURT:  2.10.  All right.  Let's go there.

12         MR. SAMUELS:  I'm sorry.  Not 2.10.

13         It's 5K2.0.  I added a 1 there.

14         THE COURT:  Yes, but that's just the general --

15         MR. SAMUELS:  Yes, sir.

16         THE COURT:  -- statement, and then it points you

17 to things that are in ensuing sections.  It, in fact,

18 says, "Departures Based on Circumstances of a Kind Not

19 Adequately Taken into Consideration, (A) Identified

20 Circumstances."  And then it says, "This subpart

21 identifies some of the circumstances that the Commission

22 may have not taken adequately into consideration."

23         And I'm asking you which of those, if any, are

24 you relying on?  By number.  Point me to them.

25         Do you want me to take a recess and give you an

1    opportunity to collect your thoughts on that and identify

2    them or are you ready to go?

3              MR. SAMUELS:  Judge, I'll take the recess.

4              THE COURT:  Okay.  We'll take a 15-minute

5    recess.

6              (Recess from 2:51 p.m. until 3:14 p.m.)

7              THE COURT:  All right.  Mr. Samuels, which of

8    the identified ones, if any, are you relying on?

9              MR. SAMUELS:  Judge, this is how I'm looking at

10   it, based on our conversation earlier.

11             THE COURT:  Well, I can hear how you're looking

12   at it.  Why don't you answer the question.

13             MR. SAMUELS:  Section 5K2.12 does not apply

14   because it was not serious coercion or duress.  So it does

15   not apply.

16             That means that under the general guidelines

17   under 5K2.0, it is something that has not been considered

18   because it didn't meet the qualifications of this other

19   guideline.  So I think that is where the departure

20   argument becomes imperfect and that it is something that

21   should be considered but didn't meet the requirements of

22   the guideline where it would normally be considered.

23             So it's probably not -- again, like I said --

24   the strongest of the arguments.  The variance under --

25             THE COURT:  Well, then that makes it a variance

1  argument.

2              MR. SAMUELS:  And that's what I want to argue

3  next, Judge, is the variance argument.

4              THE COURT:  So basically, you don't have a

5  departure argument under 5K2.0; is that right?

6              You're using it -- you're using it as an

7  imperfect -- 5K2.12 as a predicate for an imperfect

8  variance; is that right?

9              MR. SAMUELS:  Yes, sir.

10             THE COURT:  Okay.  Motion 34, ECF 34, relating

11 to 5K2.0 is denied as having been withdrawn.

12             All right.  Now let's go back to the variance.

13             MR. SAMUELS:  All right.  So, Judge, under the

14 variance, you've heard the evidence.  You've heard my

15 closing, essentially, at this point for the argument.  I

16 don't want to belabor the point, but you've seen a changed

17 man.  You've seen a gentleman who has family in need, a

18 mother who's in great need.  He's about to become a

19 father.  His family, they've testified, is living paycheck

20 to paycheck.  His income sustains this family.

21             He has other children that he owes child support

22 for that he's finally able to start paying back after

23 eight years of them not receiving it.  He has other

24 children that he's developing almost a new or different

25 relationship than what he had eight years ago.  His

1 16-year-old, when he went to prison, was 8, and she's 16

2 now.  He's got the opportunity, and has used it, to become

3 an integral part of her life again, which is just

4 incredible.

5          You've heard about his job and the work he has

6 done to ensure that he has stayed out of trouble, all

7 clean screens, no violations.  And you can even see in his

8 record from the prison that there was this and that in

9 eight years, there was only two other incidents that were

10 resolved within the prison walls, that didn't rise to the

11 case of taking it to court.  All of this he's done to

12 improve himself.  And I can't say it better than Mr. Hall

13 did.  He thanks God for prison because it saved him.  He

14 was way on the wrong path, and he has had the opportunity

15 to be turned around, and he has turned around.

16          Additional prison at this point would not

17 provide any benefit.  There is no -- I mean,

18 realistically, very few people will hear about this case.

19 There's no issue with others going, oh, I shouldn't do

20 that because this other person got this amount of prison.

21 That's not going to happen.

22          We also have the situation where he has made

23 sure that his family is taken care of.  That's something

24 that people in his community will see and will recognize

25 that you don't want to go to prison because you would be

1   losing all that he's just gained back.

2          Judge, for the reasons I stated in my written

3   motion and for the reasons that you've heard on the stand

4   today from my client and my argument, we'd ask that you

5   consider home detention under 5F1.2 or a significant

6   reduction in active time.

7          And, Judge, we would also be asking not that he

8   be -- if active incarceration is on the table still, we

9   would ask that he not be considered to go today.  In his

10  entire life, he's never been convicted of a failure to

11  appear.  He has shown up here for every single appearance.

12  He never had any problems with that at his old -- with his

13  old charge either.  And even when the Court asked to

14  continue this to today, when I called my client to tell

15  him he didn't need to come, he was already on his way

16  here.  So I think that if active incarceration is there, a

17  delayed reporting is appropriate.

18          I do think that for cigarettes, three years is a

19  lot of time.  Four years is too much, I believe.  I

20  believe that the appropriate sentence is home

21  incarceration or an alternative to incarceration that

22  involves very little active time.  Thank you.

23          THE COURT:  Mr. Panth.

24          The motion for ECF Number 34 is denied.

25  Downward departure motion is denied as having been

1  withdrawn, and we're on ECF Number 33, which is the motion

2  for variance.   What do you say?

3           To begin with, is there any evidence that this

4  defendant was involved with steroids as opposed to

5  tobacco?

6           MR. PANTH:  There is evidence that steroids got

7  smuggled into the prison as part of this scheme.  What

8  happened then, once the steroids got into the prison,

9  whether the defendant actually ended up selling them, I

10 think that's the comment that he referred to at the

11 statement -- at the plea where he said, look, I never sold

12 the steroids.

13          THE COURT:  Yeah.

14          MR. PANTH:  But the statement of facts is

15 crystal clear that at least on one occasion steroids got

16 brought into the prison as part of this scheme.

17          THE COURT:  Well, but they weren't dealt with by

18 him, according to the record, then.  It looks to me that

19 all he distributed was tobacco.

20          MR. PANTH:  Yeah.  And to make this very, very

21 simple, I think Your Honor -- we'll address the tobacco.

22 Let's put the steroids aside.

23          THE COURT:  Yeah, let's do.

24          MR. PANTH:  Let's put the steroids aside and

25 just talk about tobacco, because I think there's an

1 illusion to the fact that tobacco is -- what's the harm in

2 tobacco?  Why is tobacco that serious?

3           But we'll talk about this in the context of the

4 3553(a) factors.  This is about maintaining good order in

5 the prison.  Tobacco, as Your Honor knows, is a currency

6 in the prison.  And when you have these side illicit

7 markets for contraband that was taking place, especially

8 under a prison guard's nose, it perverts --

9           THE COURT:  Let me ask something.  People can't

10 have cigarettes in prison?

11           MR. PANTH:  Your Honor, it's --

12           THE COURT:  You can't go out in the yard and

13 smoke?

14           MR. PANTH:  I -- I've never been to prison.  I

15 don't --

16           THE COURT:  Well, I know, but you -- your boss

17 runs the prisons.

18           You can't have cigarettes in your -- in your --

19 in your cell and smoke in the cell?  You can't have

20 cigarettes in your cell and take them outside and smoke

21 them?  I always thought you could.

22           MR. PANTH:  Here's the critical element.

23           THE COURT:  Let me put it this way.  When we

24 went to -- 31 years ago at a new judge's school, they took

25 us to prison, and everybody there had cigarettes in the

1   dining hall, in their room, everywhere, and that was at a

2   time before cigarette smoking was frowned upon the way it

3   is now.  But what's the rule?

4           MR. PANTH:  It is a prohibited object, in terms

5   of --

6           THE COURT:  You can't have a cigarette?

7           MR. PANTH:  Bringing -- smuggling a cigarette

8   into prison -- the statute that -- there's a criminal

9   statute that deals with -- it counts as a prohibited

10  object for the purposes of that statute.  But it's not so

11  much just the tobacco itself.  It is the fact that there

12  is an illicit market, that there is this shop that is

13  taking place under the prison guard's nose where inmates

14  are coming in and transacting in this sort of way.  And,

15  you know, tobacco is a currency in prison.

16          The issue is not about the tobacco itself and

17  people smoking and secondhand smoke.  That's not why we're

18  here.  We're here about the breakdown of order in the

19  prison, and that is a safety risk in the prison and it

20  harms people's rehabilitation.  They are there in prison

21  to serve their sentence.  You heard several times Mr. Hall

22  say, I just wanted to do my sentence.  I didn't do

23  anything wrong in prison.  He did this while he was on an

24  active term of incarceration, and that is an aggravating

25  factor here.  I'll get to the whole 3553(a) factors, but I

1  want to address just a few of the things that the

2  defendant brought up as to the variance motion first.

3        The first is this -- this imperfect departure

4  under 5K2.12 based on coercion.  There's no evidence,

5  besides the defendant's own word, that anybody told him to

6  do anything.  And, in fact, if you look at the record, you

7  look at -- the cumulative record across these three cases,

8  this defendant is the only one who got an aggravated role

9  enhancement.  Kayla Cronin got a minor role reduction.

10 You heard from the defendant that everything that Kayla

11 Cronin did was at this defendant's own direction.  There's

12 not a shred of evidence in the record that Hall -- or

13 excuse me -- that Corrections Officer Thomas ever told

14 Cronin or this defendant to do anything.  Not a shred of

15 evidence that he ever commanded him to do anything.

16        And, in fact, if you look through the --

17        THE COURT:  Why isn't there anything in the

18 record about whose idea it was, except his testimony that

19 it wasn't his idea, it was Thomas'?  Thomas came to him.

20        MR. PANTH:  Right.

21        THE COURT:  That's the only thing that I have in

22 the record right now, as best I can tell.

23        MR. PANTH:  Well, Your Honor, I think you can --

24 there's some pretty logical inferences that Your Honor can

25 draw based on what is in the record.  Look, at the end of

1    the day, I think it is true, we don't have perfect vision

2    into kind of exactly what the conversations were that took

3    place.  We have a lot.  We can see a lot.

4                    THE COURT:  I know, but what you could have done

5    is bring Thomas here and had him testify.  Knowing what he

6    was saying in his papers, that he was being coerced by

7    Thomas, Thomas could have been here to say, no, I didn't

8    coerce him and that's not true.

9                    MR. PANTH:  Right.  And that is reflected in

10   Thomas' statement of facts.

11                   THE COURT:  What?

12                   MR. PANTH:  I mean, what Thomas says that --

13   Thomas is pointing the finger at Mr. Hall, and it's a

14   little bit of this going on, right?  Thomas points at

15   Mr. Hall.  Hall points at Mr. Thomas.

16                   THE COURT:  I don't know what Thomas said.

17                   MR. PANTH:  So Thomas blamed Mr. Hall for -- he

18   said this was all Mr. Hall's idea.  You know, I was just

19   coming off of kidney surgery.

20                   THE COURT:  Have you got the statement of facts?

21                   MR. PANTH:  I do not have it in front of me.  I

22   could probably pull it up.

23                   THE COURT:  Thomas'.

24                   MR. PANTH:  Yes, Your Honor.

25                   But what I'm telling Your Honor is that --

1          THE COURT:  Excuse me.

2          See if you can find the statement of facts in

3  Thomas.  It's another defendant in the same case.  So this

4  is Defendant 001.

5          MR. PANTH:  Right.

6          THE COURT:  Thomas is what?

7          MR. PANTH:  Well, this would be 3:24 CR -- I

8  believe it's 36, if I'm getting that correct.

9          THE COURT:  Thomas is 36?

10          MR. PANTH:  Yes, Your Honor.

11          THE COURT:  Okay.  3:24 CR 36.

12          THE CLERK:  Daniel Thomas?

13          MR. PANTH:  Yes, Your Honor.

14          I'll try to pull this up here.

15          THE COURT:  Thank you.

16          THE CLERK:  You're welcome.

17          THE COURT:  Do you have it there?

18          MR. PANTH:  I am taking a look at the statement

19  of facts right now.  If Your Honor will just give me a

20  moment.

21          THE COURT:  I may be wrong, but in reading what

22  I've read here in ECF 14 in Case Number 3:24 CR 36, which

23  is the statement of facts in the Thomas case, I don't see

24  anything in there where Thomas says it was Hall's idea.

25          MR. PANTH:  Yeah, I don't think he said it

1   explicitly, as I'm reading this.  What I'm looking at here

2   is 9(b), "In return for Thomas' agreement to facilitate

3   the introduction of prohibited objects into FCC Petersburg

4   by smuggling in the prohibited objects and for not

5   interfering with CC-1's distribution, CC-1 promised to pay

6   bribes to Thomas."  And I may be just conflating here,

7   Your Honor, counsel's conversations with me versus what

8   was actually reflected.

9           THE COURT:  Yeah.

10          MR. PANTH:  But, you know, I mean, I think the

11  statement of facts in both cases refer to an agreement

12  between Thomas and Hall.

13          But I do think it's instructive for the Court to

14  look at the statement of facts portion where there were

15  certain times when it was a slow week in this prison

16  marketplace that Hall was running, and in those times, he

17  directed Cronin to tell Thomas, "Don't bring any more

18  contraband in."  And I think it's instructive because it

19  shows the Court that it's not like this was being force

20  fed down his throat.  He had the capability to tell

21  Thomas, "Hey, don't bring any more in."

22          And, in fact, he did, at least on some

23  occasions, tell him, "Slow it down, don't bring anything

24  in."  And that, I think, to at least some degree, belies

25  this notion that Thomas was just jamming this product down

1  Mr. Hall's throat.

2          THE COURT:  It's not having the product.  That's

3  not the point that was being made.

4          The point is it was -- was the involvement.

5  Let's do it.  Let's do this thing together.  It will take

6  two of us.  It takes me to bring it in --

7          MR. PANTH:  Yes, Your Honor.

8          THE COURT:  -- if I'm Thomas, and it takes you

9  to get it distributed --

10          MR. PANTH:  Yes, Your Honor.

11          THE COURT:  -- among the inmates because I --

12  who will buy it.  And Hall says -- the testimony on the

13  record here is that it was Thomas' idea and Thomas kept

14  pushing him and he finally succumbed not because he was

15  threatened, because he said he wasn't threatened, but

16  because he feared what Thomas could do to make his life

17  miserable and Thomas made illusions to that.

18          MR. PANTH:  Well, and I think the last --

19          THE COURT:  I think that's a fair summary of the

20  evidence.

21          MR. PANTH:  That is a fair summary of the

22  defendant's statements, absolutely.  But you also have to

23  look at it in the context of the -- this last portion in

24  the statement of facts where Hall tells you exactly why he

25  was doing this scheme.  He doesn't say to Cronin --

1          THE COURT:  Is this his statement of facts?

2          MR. PANTH:  This is his own statement of facts.

3          THE COURT:  In this case?

4          MR. PANTH:  This is -- in Hall's case.

5          THE COURT:  Yeah.

6          MR. PANTH:  Exactly.

7          THE COURT:  Yeah, I just want to get the right

8  one.

9          MR. PANTH:  Absolutely.

10          THE COURT:  What paragraph?

11          MR. PANTH:  So if you look at PSR page 10.

12          THE COURT:  Well, I've got the statement of

13  facts in front of me.

14          MR. PANTH:  Oh, you've got the statement of

15  facts.

16          THE COURT:  What paragraph is it?

17          MR. PANTH:  So let's look first at 10(n),

18  subparagraph (n).

19          THE COURT:  On October 30, 2022?

20          MR. PANTH:  Yes, sir.

21          So Hall tells Cronin -- now, this is Hall

22  talking to Cronin saying, "I can still keep this shop up

23  and running, and then start a new shop, you know what I

24  mean."

25          This is the same month that the defendant is

1   being transferred to a different prison.  We have evidence

2   on the record and in the statement of facts, we know what

3   shop means.  Bike shop refers to the illicit contraband

4   that's taking place in the prison.  So the same month that

5   Hall is being moved to a different prison, where Daniel

6   Thomas is not at that other prison, right?  Hall is moving

7   to a different prison and he's talking about setting up a

8   new shop.

9            THE COURT:  At that prison?  Is that --

10           MR. PANTH:  That was his words.  "I can still

11  keep this shop up and running, and then start a new shop,

12  you know what I mean."

13           And I think it's a reasonable inference for the

14  Court to look at that and say he's starting a new shop at

15  the new prison that he's moving to this very month.  And

16  you heard Mr. Hall's own testimony saying it was

17  October 2022 when he was being transferred to the other

18  prison.

19           THE COURT:  If I were -- what do you do about

20  the next sentence, though, where it depends upon --

21  everything depends upon Thomas?  It's a very rare

22  circumstance.  I mean, it doesn't augur that he's going to

23  set up a shop in another prison.  He says set up a shop in

24  the same prison.

25           MR. PANTH:  But I think that sentence is

1   instructive because it shows you the motivation for why

2   Hall is doing what he's doing.  He doesn't say, "Oh, man,

3   I wish Thomas would stop beating me down with these

4   tobacco -- with this tobacco that he's making me sell."

5   What he's saying is that this is a once-in-a-lifetime

6   opportunity.  It is -- "because, you know, for real, for

7   real, me getting landlord, a shop landlord that works with

8   me the way the landlords working with me now.  That's very

9   rare.  That's a once in a lifetime opportunity."

10          Your Honor, I think you look at that and really

11  the only inference I can draw from that is that it is

12  greed.  It is greed that is motivating this, and this

13  completely belies this notion that anybody was forcing him

14  to do anything.  These are the defendant's own words that

15  same month.

16          So I -- I think especially where he talks about

17  this as a once-in-a-lifetime opportunity belies this

18  narrative that he was coerced to do any of this.  I think

19  when he tells you why he did it, Your Honor should believe

20  him.

21          THE COURT:  All right.  Anything else?

22          MR. PANTH:  Yes, Your Honor.

23          I'd like to talk also a little bit about some of

24  the other grounds for a variance that he brought up.  The

25  fact that he's successfully employed, that does not take

79

1  him out of the heartland of other defendants who come

2  before this Court.  That is just, frankly, not a proper

3  basis for a variance and that should be taken off, the

4  fact that he has a job.

5          I do want to address the fact that he is --

6          THE COURT:  It isn't that he has a job.  We're

7  told in *Concepcion* that we are to look at the defendant

8  not at the time of the offense but at the time of

9  sentencing.

10          MR. PANTH:  Yes.

11          THE COURT:  That's the message.  Whether it

12  makes -- whether it's right or not is not the issue.  The

13  Supreme Court has said that's the measure.

14          MR. PANTH:  Yes.

15          THE COURT:  So that says -- and that's in

16  context of a 404 motion for reduction of sentence.

17          MR. PANTH:  Right.

18          THE COURT:  But the message of *Concepcion* is

19  that these principles apply at sentencing --

20          MR. PANTH:  Yes.

21          THE COURT:  -- at reductions of sentencing and

22  at motions for compassionate release.

23          MR. PANTH:  Absolutely.  And I think we can

24  take -- we can take this in the context of --

25          THE COURT:  So that means look at -- and in

1   *Concepcion*, they said you look at post-offense

2   rehabilitation.   And I think I have -- I think that's the

3   way to look at it, at what *Concepcion* means, and that's

4   what we're to do.

5          MR. PANTH:  Yes, Your Honor.  And if I'm

6   understanding the framework correctly, this is under the

7   history and characteristics of the defendant, right?

8          THE COURT:  Yeah.

9          MR. PANTH:  And really what we're talking about

10  is the history -- this 3553(a) factor, is it so

11  extraordinary that it brings this defendant out of the

12  heartland of criminal defendants who normally come before

13  this Court.  I think that's the threshold and that's the

14  inquiry that we're in here, and, I mean, I think the

15  record very clearly shows that it's not.  And let's talk

16  about why.

17         Of all the people charged in this case, only the

18  defendant had a criminal history, and it's a pretty severe

19  one.  He had so many crimes here for which he received no

20  criminal history points.  Talk about domestic violence

21  against women.  That's PSR paragraph 32.  Criminal

22  trespassing, PSR paragraph number 31.  Contempt of court,

23  PSR paragraph 34.  And, you know, there's some -- it seems

24  like he was arrested for failure to appear, PSR

25  paragraph 37 as well.

1          You know, Your Honor, the defendant brought up

2     on a couple of occasions that he had only two infractions

3     while he was in prison.  I don't understand why having two

4     infractions in prison is a basis for a downward variance.

5     That is not meritorious conduct, Your Honor.  That's

6     aggravating conduct, if nothing else.  Not only was he

7     committing this crime when he was in prison, but he was

8     also, on July 21st, 2023, cited for refusing to obey an

9     order and being insolent to a staff member, and

10    February 20th of 2019, possessing drugs and alcohol.

11    That's PSR paragraph 40.

12          The defendant also did receive criminal history

13    points for other crimes, methamphetamine trafficking in

14    2016, and as part of that scheme, he was also found to be

15    in possession of a firearm.  That's PSR paragraph 40.  You

16    know, I -- you've got to look at these too when you talk

17    about the history and characteristics of the defendant.

18          And to be -- to be fair, I think Mr. Hall's life

19    does reflect certain hardships that he faced, neglect of

20    his mother from drug abuse and suffering physical abuse

21    from his mother.  And he appears that he wants to take

22    care of his ailing mother, and we certainly understand

23    that, but, Your Honor, none of these place this defendant

24    outside the heartland of criminal defendants who normally

25    come before this Court.  None of these are so

1    extraordinary circumstances that they pull this -- that

2    they're warranting of a downward variance certainly.

3            You know, as to this point about taking care of

4    his mother as well, you know, it's -- one thing that I

5    guess we noted or didn't really fully understand here is

6    that the defendant -- the way they framed that issue was

7    that the defendant was under such stress while he was in

8    prison having a mother that was in these sort of

9    circumstances -- and I can give you an exact cite to the

10   defense papers on exactly this point.  If you'll just give

11   me one moment.  My technology does not seem to be working.

12           THE COURT:  Does the guideline book refer to the

13   test for variances?

14           MR. PANTH:  The test for variances with respect

15   to family ties and responsibly, Your Honor?

16           THE COURT:  Variances at all.  Does it refer to

17   variances at all?

18           MR. PANTH:  I don't believe they do, Your Honor,

19   because I think it's a variance predicated on the 3553(a)

20   factors.

21           THE COURT:  Yeah.

22           MR. PANTH:  But, you know, even if you look at

23   it from the factor of family ties and responsibilities --

24           THE COURT:  Well, what is it that provides the

25   rule for a variance?

83

1           MR. PANTH:  It's *Diosdado-Star*.

2           THE COURT:  And what does *Diosdado-Star* tell

3   us about a variance?

4           MR. PANTH:  *Diosdado-Star* says that we -- I

5   might be butchering this a little bit, but we start with

6   an assessment of where the guidelines are and then we look

7   relative to that posture, and the Court must explain

8   relative to that posture any factors that are of such a

9   substantial consequence that bring it out of the ambit of

10  the guidelines.

11          THE COURT:  Where is that language?

12          MR. PANTH:  I thought it was *Diosdado-Star*, but

13  I could be mistaken, Your Honor.  I thought that was the

14  framework of *Diosdado-Star*.

15          THE COURT:  I don't think it is.  It may be.

16          Get 630 F.3d 359, please, and 944 F.3d 213.

17          What I'm looking for is where you find the

18  language that talks about the way you do the 3553 analysis

19  if it operates within the context of whether it takes the

20  matter outside the heartland of the guidelines.

21          MR. PANTH:  Yes, Your Honor.

22          THE COURT:  I'll give you *Diosdado-Star* and ask

23  you to find it.

24          Can we give this to him, please?

25          437 F.3d 424, please.

1        MR. PANTH:  So *Diosdado-Star* does not use the

2   word heartland.  So I think that concept occurs probably

3   somewhere else, as far as I can see.

4        THE COURT:  I just think a variant sentence is a

5   sentence that is a nonguideline sentence.  And I want --

6   and that's what *Moreland* holds.

7        And then the question is you have to, of course,

8   identify the guidelines and determine why, if at all, a

9   sentence -- if you're not using the departure method, why,

10  if at all, it should not be within the guidelines.

11       MR. PANTH:  Right.  And I think in this

12  framework, the Court has a lot of discretion to look at

13  what the general baseline is, you know, when looking at a

14  particular factor.  Because this is predicated on the

15  3553(a) factors.  Really, the Court uses its own judgment

16  and has wide discretion from the Fourth Circuit to look at

17  this and make a determination of whether or not the

18  defendant's conduct is within the ambit of defendants who

19  normally come before this Court.

20       And it's a continuum, Your Honor.  I think on

21  any one factor you could place the defendant within the

22  guideline range or if there's any one specific aspect of

23  this that takes him so far outside the ambit of what

24  Your Honor normally sees, you can then depart either

25  downward -- or vary, rather, downward or upward.  That's

1 always been my understanding of how this works.

2          THE COURT:  That's quite different than the test

3 you've been urging, though.

4          MR. PANTH:  I think what -- and if I misspoke, I

5 apologize.  I think what I've been urging --

6          THE COURT:  I'm not criticizing you.  I think

7 you're probably right, but I think it's different than

8 what you say.  That's all.

9          MR. PANTH:  Maybe I inadvertently said something

10 right.  But I think what I was suggesting for -- that

11 Your Honor adopt is to look at -- because the defense has

12 framed this argument as a 3553(a) argument and

13 specifically under the history and characteristics of the

14 defendant.  So I am bringing to light -- and my reference

15 to his criminal history was to bring in light to the Court

16 of, okay, well, if we're going to look at history and

17 characteristics of the defendant, look at all aspects of

18 that particular factor, right.  It's not simply the

19 defendant saying, hey, I've got a mother who is sick.  I

20 mean, even on that aspect itself, I think the government

21 still prevails that there's -- that's not a basis for a

22 downward variance because he hasn't -- that itself is not

23 enough, I would assert.

24          But then if you look at it in the broader

25 context of even that 3553(a) factor, I think that factor

1  cuts against him and actually that factor, when properly

2  considered, is an aggravating factor within the 3553

3  framework.   It should pull the sentence, I think, more

4  towards the high end of the guidelines, and the government

5  could have moved even for an upward variance on the basis

6  of understated criminal history.   We didn't do that here

7  because I think the 3553(a) factors allow the Court enough

8  flexibility to consider all of these things.

9          THE COURT:   Well, it says -- give me a minute,

10 please.

11         Okay.   In *U.S. v. McKinnie,* 21 F.4th 283 at 289,

12 the Fourth Circuit tells us that there may be sentences

13 above the guideline range through either a departure or a

14 variance.   "A departure is a deviation from the guideline

15 range computed by examining the provisions of the

16 guidelines themselves, while a variance is a deviation

17 from the guidelines range based on application of the

18 statutory factors 18 U.S.C. 3553(a).   An upward variance

19 can be imposed if it's justified by the 3553(a) factors,

20 as considered under the totality of the circumstances."

21         So that tells us look at all the circumstances

22 and see whether a sentence within the guideline range is

23 appropriate if you measure them by the 3553(a) factors.   I

24 don't see that if they're present to an extent outside the

25 heartland of the guidelines.   So that's guideline

1 departure language.  Outside the heartland of the

2 guidelines is the guideline language itself.

3          MR. PANTH:  And, you know, I could completely

4 have this wrong.

5          THE COURT:  Just a minute.  I'm continuing.

6          "The distinction between variances and

7 departures matters.  Even if the but-for causation

8 standard applies to a sentencing departure under the

9 guidelines, it is not similarly required for an upward

10 variance under 3553(a)."  The same thing would be true on

11 the other way, down as well as up, because it doesn't make

12 any difference which way you're going in terms of

13 assessing the principle by which you proceed.

14          "District courts need not commit themselves to a

15 specific, enumerated departure when weighing the 3553(a)

16 factors.  They may thus consider evidence that a

17 defendant's actions contributed to death or serious

18 injury.  That is so even if the evidence is insufficient

19 to meet the but-for causation."

20          MR. PANTH:  The point I was trying to make, and

21 maybe I didn't make it so clearly, is that whether we're

22 talking a variance or a departure -- and I think this is

23 even true in terms of a variance.  The Court -- the

24 critical question for the Court is variance relative to

25 what?

1          THE COURT:  The variation is outside the range

2     of the guidelines, either up or down.

3          MR. PANTH:  Yes, Your Honor.  And to make that

4     determination, I think Your Honor uses your experience of

5     sentencing many defendants, perhaps other defendants

6     convicted of similar crimes, and you're placing these

7     defendants within your head on a continuum.

8          Some of those defendants had conduct that fell

9     within the guidelines at different points within the

10    range, and really what I think the exercise that

11    Your Honor is doing is looking at this defendant and his

12    conduct specifically, even as to the particular factors,

13    and saying, okay, well, where does that stack up relative

14    to Your Honor's own experience and common sense and

15    understanding of the baseline.  What is the baseline is

16    the question.

17         So my invocation of the heartland, really the

18    concept I'm trying to get in front of the Court is that

19    nothing that the defendant has brought up is at all

20    different or dissimilar to so many defendants who come

21    before this Court, and certainly it does not weigh in the

22    defendant's favor even when you look at the history and

23    characteristics of the defendant.  That was the point I

24    was trying to get across.

25         And I understand that heartland may be a

89

1   departure-linked concept.

2           THE COURT:  Well, that also says that it's

3   proper for the Court to reach back into history and

4   measure what other people have done.

5           MR. PANTH:  Yes, Your Honor.

6           THE COURT:  And I'm not sure that falls within

7   the totality of the circumstances analysis that is called

8   for by the decisions we've been talking about.

9           MR. PANTH:  Your Honor, I think, has a --

10          THE COURT:  The variance is outside the

11  guideline sentence, and you look at the 3553(a) factors

12  and say, considering those factors, any one of them or all

13  of them together, or some combination of circumstances,

14  warrant, on the basis of an analysis of the totality of

15  the circumstances, a sentence that is greater than that

16  provided for in the guidelines or that is less.

17          MR. PANTH:  Right.  Okay.  Well, I --

18          THE COURT:  It doesn't say go look at

19  everybody -- all the other cases.

20          Now, it is correct that there is a place for

21  that analysis, and that is in the disparity of sentencing

22  component of the 3553(a) factors.  It specifically

23  commands -- what is it, section 6 or 8, one of the two --

24  commands that there not be a sentence outside the

25  guidelines -- I mean that provides a disparity, and that

1    does necessitate that analysis.

2           MR. PANTH:  Yes, Your Honor.

3           THE COURT:  Let's see.  "6.  The need to avoid

4    unwarranted sentencing disparities among defendants with

5    similar records who have been found guilty of similar

6    conduct."

7           Well, but I can't make that decision at all

8    unless there is some evidence in the record about what

9    similar defendants have gotten.  And I have had cases as

10   recently as yesterday, or the day before, of where there

11   were citations to the Sentencing Commission statistics

12   that say that the average person who gets a sentence for

13   possession of child pornography or for possessing a gun

14   with a magazine of a certain size, that the mean, average,

15   or whatever it is, sentencing that they cite is X, and

16   then I have something in the record that allows me to make

17   that judgment.

18          MR. PANTH:  Right.  There's no record here on

19   that.

20          THE COURT:  But there's no -- I can't make a

21   free-standing analysis about whether somebody is in or out

22   of the heartland in a variance analysis, I don't think.

23          MR. PANTH:  Okay.  No.  I think that's fair.

24   And maybe what's most helpful right now, let me just talk

25   about the 3553(a) factors, and this is going to be related

1    to my variance arguments and my actual sentencing

2    arguments themselves and why I think this conduct is

3    pretty bad.

4              So I think the Court --

5              THE COURT:  Well, let me talk to you all for a

6    minute about this.

7              I don't think the briefing is directed properly

8    to the record that existed before the testimony as

9    respects the variance, and I don't think that the briefing

10   addresses the issue of variance the way it needs to

11   address it.

12             So I think what I'd rather do is have you all

13   have some supplemental statements of position on the

14   variance motion and key it to what the record is now,

15   because it's pretty different than what was in these

16   papers.  And I have to tell you this, that in my judgment,

17   I'm having a hard time figuring out why his sentence ought

18   to be any different than Thomas'.

19             MR. PANTH:  Well, if Your Honor were to give

20   him a lower -- I mean, Thomas got a low end of guidelines

21   sentence.

22             THE COURT:  He got 24 months, Thomas did.  Now,

23   why should his be any different than Thomas'?

24             MR. PANTH:  Because he has --

25             THE COURT:  He -- Thomas breached all kinds of

1 obligations, and he really was -- it couldn't have

2 happened without him.  But the Hall situation is that he

3 got an aggravating role, but it was because he really was

4 directing Cronin's activities.

5          MR. PANTH:  Yes, Your Honor.

6          THE COURT:  And he was doing some internal

7 management within the system -- supply control, as you

8 pointed out, I think you called it.  I may be wrong.

9          And I'm just not sure that the variance argument

10 has been properly examined in the way that it needs to be.

11 Because it does seem to me that his -- that they are both

12 essential cogs in the wheel of getting it done.  One is

13 the bringer-inner and the other one is the distributor but

14 within.  There isn't anything in the record that tells me

15 who was the driver of the boat except his testimony, which

16 was that the driver of the boat was really Thomas, which

17 says -- which is -- he pressured him into -- Thomas

18 pressured him into getting into this and he did it out of

19 apprehension, but he withdrew.  He withdrew from it by

20 getting out of the situation.

21          And then -- but the -- the argument with respect

22 to the withdrawal is somewhat substantially undercut by --

23 I think it's paragraph (n), the shop, I can get a better

24 deal.  I don't know exactly what that means, but I think

25 this whole topic of the variance needs to be addressed

1  more concretely and in a framework that actually starts

2  off by saying a variant sentence is this, and here is the

3  measure of a variant sentence, and here's how you look at

4  it, and using the case law and develop the structure, and

5  then tie the facts to the record.

6          And the arguments that you're making require

7  some subtle moves that may be -- subtle analytical moves

8  that may be warranted.  I don't know, but they may not be

9  either.  So --

10          MR. PANTH:  Well --

11          THE COURT:  -- I think I'd like to have

12  supplemental statements of position of a variance issue,

13  Number 33.

14          Since it's you who are making the variance

15  argument, I expect you to get into the weeds and learn it

16  and present it the right way, Mr. Samuels.

17          MR. SAMUELS:  Yes, sir.

18          THE COURT:  How long is it going to take you to

19  get me another brief?

20          MR. SAMUELS:  Judge, what I'd like to do,

21  without getting on thin ice with the Court, is to request

22  a copy of the transcript.  I'll work with them to get it

23  and figure out what the timeline is for that.

24          THE COURT:  Tomorrow morning, if you pay for it.

25          MR. SAMUELS:  I will pay for it.

1        THE COURT:  Settle up with her when she --

2   you're going to get the transcript.

3        MR. SAMUELS:  Judge, once I have that --

4        THE COURT:  Are you retained or am I paying you?

5        MR. SAMUELS:  You're paying me, Judge.

6        THE COURT:  Okay.  So -- but anyway, I do think

7   it's important to get it done while it's fresh in my mind,

8   but I also think it's Friday afternoon.  It's hardly fair

9   to ask her to produce a transcript over the weekend.

10        MR. SAMUELS:  I agree.

11        THE COURT:  Tell him when you think you want to

12   give it to him.

13        THE COURT REPORTER:  One week, seven days.

14        MR. SAMUELS:  That's fine by me.

15        THE COURT:  All right.  Now, you'll have the

16   transcript in seven days.  But in the meantime, you don't

17   need to be somnolent.  You know what the issues are.  Get

18   into the bookery and find out what goes on in the old

19   books.  As Judge Williams used to say, "Beware of the

20   young man with the book."  And this requires some booking.

21   All right.  So you get to work.

22        Thinking that you will do that and get to work,

23   then when you get the transcript, how much longer do you

24   need to file?

25        MR. SAMUELS:  Between two and three weeks.

1              THE COURT:  Between two and three weeks is two

2     and a half weeks, and that comprises a number of days.

3     What do you want?

4              MR. SAMUELS:  Judge, may I please have --

5              THE COURT:  Do you want three weeks?  Is that

6     what you're asking for?

7              MR. SAMUELS:  Judge, we are at the 16th of

8     August.  May I have until --

9              THE COURT:  We are.

10             MR. SAMUELS:  -- September 16th?

11             THE COURT:  Yes, September 16th.

12             MR. PANTH:  Your Honor, I will be out of the

13    country, without access to my devices, from September 11th

14    through September -- I want to say -- let me --

15             THE COURT:  You are the most well-traveled

16    public servant I've ever been involved with.

17             MR. PANTH:  Your Honor, I try to do it when I'm

18    young.

19             THE COURT:  That's when you should do it.

20    Believe me.

21             MR. PANTH:  I'll be back on the 19th.

22             THE COURT:  When would you like to respond?

23             MR. SAMUELS:  Could I just file it on the 19th

24    or the 20th so that he's not having to think about it on

25    his vacation?

1          THE COURT:  Oh, that's altruistic to a fault.

2          MR. PANTH:  I will be thinking about nothing but

3  this on my vacation.

4          THE COURT:  I'm sure.  Oh, my goodness.  We've

5  gone afar.

6          MR. PANTH:  All right.  So, yeah, I mean,

7  I'll -- I'll just take two or three days, but if I can

8  have in the middle of -- so maybe until Tuesday, the 24th,

9  I'll have it done.

10          THE COURT:  Of September?

11          MR. PANTH:  September 24th.

12          THE COURT:  I'll give you whatever -- a lawyer

13  is entitled to vacations.  They work hard, and they are

14  very much entitled to them.  One thing I learned from

15  Judge Merhige is that that's one of the reasons he would

16  give continuances and extensions, if he thought you were

17  on vacation.

18          Okay.  So you're going to file yours on the

19  16th.  Is that what you said?

20          MR. SAMUELS:  If that's what the Court wants.

21  I'd ask for the 19th or the 20th, but I'll do what the

22  Court says.

23          MR. PANTH:  If you're doing the 16th, I can get

24  it in by the 24th.

25          THE COURT:  Twenty what?

1           MR. PANTH:  24th, Your Honor.

2           THE COURT:  All right.  And then you file your

3  reply on the 27th.

4           MR. SAMUELS:  27th.

5           THE COURT:  All right.

6           So your opening is the 16th.  He's the 24th.

7  Your reply is the 27th.  And then we will have the

8  sentencing on October the 10th at 10 a.m.

9           MR. PANTH:  Works for me, Your Honor.

10          MR. SAMUELS:  Yes, sir.  At 10 a.m.?

11          THE COURT:  Yes.

12          Mr. Hall --

13          MR. SAMUELS:  In terms of traveling from

14  Kentucky --

15          THE COURT:  Where are you in Kentucky?

16          THE DEFENDANT:  Lexington, Kentucky.  Actually,

17  I live in Newport.  I work in Lexington.

18          MR. SAMUELS:  It's a ten-hour drive.

19          THE COURT:  Well, Newport --

20          MR. SAMUELS:  I was just trying to make sure

21  that he wasn't driving through the night.

22          THE COURT:  Newport is -- did they move it?

23          THE DEFENDANT:  MapQuest says 8 and a half, but

24  by the time you stop and get gas and get a little dinner,

25  it's about ten hours.

1              THE COURT:  From Newport?

2              THE DEFENDANT:  From Newport, Kentucky.

3              THE COURT:  Huh.  I guess my wife drives faster

4    than I thought she does.  So you just come up the night

5    before.

6              THE DEFENDANT:  Yes, sir.

7              THE COURT:  Yeah.

8              MR. SAMUELS:  Okay.  Then it's good for us.

9              THE COURT:  All right.

10             All right.  I think that will produce a better

11   result here.  And I'd like -- I wanted to share with you

12   my concern about the size of the sentence here, and I

13   think that it is important that you be mindful of the fact

14   that *Concepcion* tells us that you look at the person at

15   the time of sentencing, not at the time of the offense.

16             And that's important particularly in cases

17   where -- and they do say, in that respect, look at

18   post-offense rehabilitation.  And that's important where

19   there is a widespread of time from the date of the offense

20   to the date of the conviction and sentencing.  So those

21   are things to think about, without in any way discounting

22   the seriousness of the offense at all.

23             I give to the clerk defense exhibits.  They are

24   all right here.

25             And those go with the case yesterday.

1          THE CLERK:  Okay.

2          THE COURT:  All right.  I don't like delaying

3    things like this, but I think it's important and I don't

4    think that it's been -- the issue is presented in the

5    fashion that will produce the best results for all

6    concerned.  So -- all right.  We'll be in adjournment.

7          (The proceeding concluded at 4:20 p.m.)

8                    REPORTER'S CERTIFICATE

9       I, Tracy J. Stroh, OCR, RPR, Notary Public in and for

10   the Commonwealth of Virginia at large, and whose

11   commission expires September 30, 2027, Notary Registration

12   Number 7108255, do hereby certify that the pages contained

13   herein accurately reflect the stenographic notes taken by

14   me, to the best of my ability, in the above-styled action.

15      Given under my hand this 23rd day of August 2024.

16

17   _____
                    /s/
              Tracy J. Stroh, RPR

18

19

20

21

22

23

24

25